*In re* NESTOROVSKI ESTATE

Docket No. 271704. Submitted January 8, 2008, at Detroit. Decided March 31, 2009, at 9:20 a.m.

Bora Petrovski filed a petition in the Oakland County Probate Court challenging the validity of a will and two deeds signed by her father, Vlado Nestorovski. The decedent had bequeathed all of his property and assets to the respondent, Vasko Nestorovski, the petitioner's brother, with the exception of a $60,000 payment to the petitioner, and had quitclaimed his individual ownership of two Michigan properties to the respondent. The petitioner alleged that the respondent had unduly influenced the decedent and that the decedent had lacked the requisite testamentary capacity at the time he signed the will, which had named the respondent as the personal representative of the estate, and had lacked the competency to execute the deeds. The petitioner sought to have the will and the deeds set aside and requested an award of attorney fees and costs. The court, Eugene Arthur Moore, J., entered an order prepared by the petitioner's attorney and approved by the respondent's attorney that set the matter for binding arbitration before a sole arbitrator selected by the parties. The arbitrator determined that the decedent had been subjected to undue influence and had not been competent to make a will and recommended setting aside the quitclaim deeds and a power of attorney signed by the decedent and distributing the assets equally between the petitioner and the respondent. The arbitrator further recommended that each party bear its own attorney fees and that no fees be charge to the estate. The respondent eventually contested the entire arbitration award, contending that pursuant to *In re Meredith Estate*, 275 Mich 278 (1936), the probate court lacked the authority to refer to arbitration the parties' estate-based dispute concerning the decedent's testamentary capacity. The court subsequently adopted the arbitrator's decision and award in its entirety. The respondent appealed.

The Court of Appeals *held*:

1. The respondent's claim that the parties lacked a written arbitration agreement is factually and legally unfounded.

2. The distinctions between this case and *In re Meredith Estate* are highly significant and render that case inapplicable to this case. Here, unlike in *In re Meredith Estate*, all the interested parties stipulated in writing to submit their dispute to binding arbitration and the arbitrator held a hearing during which she placed the witnesses under oath.

3. Since *In re Meredith Estate* was decided, there have been three substantial revisions of Michigan's probate laws and significant procedural innovations have accompanied the evolution of the probate court's substantive powers. Along with the Legislature's modernization of probate practice, Michigan's courts have approved an expansion in the use of alternative dispute resolution procedures. Although the Supreme Court suggested in obiter dictum in *In re Meredith Estate* that arbitration would divest the probate court of its rightful jurisdiction, that rejection concerned the particular probate arbitration conducted in *In re Meredith Estate*. Other precedents support the proposition that the Supreme Court has approved of and accepted properly conducted common-law arbitration in probate matters. Probate proceedings do not inherently lack arbitrability. As shown by the Supreme Court's unconditional acceptance and enforcement of an arbitration agreement in *Hoste v Dalton*, 137 Mich 522 (1904), the Supreme Court has signaled that, even under the probate laws existing 100 years ago, properly convened and conducted arbitration could resolve a will contest.

4. The Estates and Protected Individuals Code, MCL 700.1101 *et seq.*, which took effect in April 2000, has eliminated virtually all the restrictions that applied to probate court powers when *In re Meredith Estate* was decided in 1936.

5. To the limited extent that *In re Meredith Estate* barred arbitration of probate disputes, that holding lacks continued viability because it has been superseded by more recent legislative developments and intervening changes in the court rules. The central holding of *In re Meredith Estate* lacks applicability in this case and does not preclude the instant parties from conducting binding common-law arbitration of probate disputes, including the question of testamentary capacity, because here, unlike in *In re Meredith Estate*, all the interested parties had notice of the contemplated arbitration, agreed that the arbitration would supply a binding resolution regarding the decedent's testamentary capacity, and actively participated in the arbitration process.

6. This case involves common-law arbitration, to which the statutory arbitration procedures do not apply, because the order submitting the parties' dispute to arbitration did not provide that

a judgment could be entered in accordance with the arbitrator's decision. The common law does not limit the parties' ability to arbitrate real estate disputes and does not preclude arbitration regarding the decedent's capacity to execute the deeds. Although MCL 600.5005 prohibits the submission of certain real estate disputes to statutory arbitration, MCL 600.5005 does not apply to or restrict common-law arbitration.

7. The probate court had the authority to set aside the power of attorney.

8. The arbitrator, with regard to the distribution of the decedent's entire probate estate, had authority to consider the decedent's capacity to execute the power of attorney in 2000.

9. The respondent did not defend the will in good faith, given the arbitrator's finding that the respondent had exerted undue influence on the decedent. Therefore, the respondent was not entitled to have his attorney fees paid by the decedent's estate.

Affirmed.

SAAD, C.J., dissenting, stated that although he agrees that the Supreme Court would overrule *In re Meredith Estate* today if faced with the question whether testamentary capacity is arbitrable, the Court of Appeals does not have the authority to rule contrary to *In re Meredith Estate* simply because of a belief that the Supreme Court would overturn its precedent in light of legislative, court rule, and decisional law changes. Until the Supreme Court states otherwise, the Court of Appeals is bound by the principle of stare decisis to follow the holding in *In re Meredith Estate* that testamentary capacity is not arbitrable. The probate court's order affirming the arbitration award should be reversed.

1. WILLS — DECEDENTS' ESTATES — ARBITRATION — COMMON LAW — TESTAMENTARY CAPACITY.

Properly convened and conducted binding common-law arbitration may be used to resolve a will contest, including the question of the testator's testamentary capacity.

2. COMMON LAW — ARBITRATION — DEEDS — CAPACITY TO EXECUTE DEEDS.

The common law does not limit parties' ability to arbitrate real estate disputes, including a person's mental capacity to execute a deed.

*Payne, Broder & Fossee* (by *Andrew J. Broder*) and *Underwood & March* (by *Lauren M. Underwood*) for the petitioner.

*Kemp Klein Law Firm, P.C.* (by *Alan A. May* and *Debra Nance*), for the respondent.

Before: SAAD, C.J., and BORRELLO and GLEICHER, JJ.

GLEICHER, J. Respondent, Vasko Nestorovski, appeals as of right an Oakland County Probate Court order adopting an arbitrator's decision invalidating the decedent's 2001 will, setting aside two deeds signed in 2001 and a power of attorney signed in 2000, and distributing the assets of the decedent's estate pursuant to the laws of intestate succession. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Vlado Nestorovski, the decedent, was born in Macedonia in 1925. In 1972, Vlado and his wife emigrated to the United States. The Nestorovskis' two children, respondent and petitioner, Bora Petrovski, are the only interested persons for the purposes of these proceedings.[1]

In April 2001, respondent consulted attorney Rod Sarcevich regarding an estate plan for Vlado. Sarcevich referred respondent to attorney Ronald Ambrose. Ambrose met with respondent and Vlado at his law office. Ambrose later testified that during their meeting, which lasted less then 10 minutes, Vlado spoke only "broken English." The parties agree that Vlado could not read or understand documents written in English. After Ambrose's single brief meeting with Vlado and respondent, Ambrose prepared Vlado's will, which bequeathed all of his property and assets to respondent, with the exception of a $60,000 payment to petitioner. Ambrose also prepared two quitclaim deeds conveying

---

[1] Vlado's wife, Vesna, died in 1994 and is not an interested party. MCR 5.125(C)(8)(a).

Vlado's individual ownership of two Michigan properties to respondent, with joint ownership and survivorship rights.

On April 25, 2001, Sarcevich brought the will, the deeds, and another power of attorney to the home Vlado shared with respondent and respondent's family.[2] Vlado signed the documents in the presence of a priest and a neighbor. Sarcevich admitted that he did not speak Serbian and that he made no effort to explain the documents to Vlado. The priest, a certified translator, translated the documents into Serbian for Vlado.

After Vlado's death, petitioner filed in the Oakland County Probate Court a petition challenging the validity of the will and the two deeds. The petition alleged that respondent unduly influenced Vlado and that Vlado lacked the requisite testamentary capacity because he had suffered from Alzheimer's disease since 1999. Petitioner sought to have the will and the deeds set aside and requested an award of attorney fees and costs.

The probate court ordered the parties to engage in facilitation of their dispute. On May 20, 2005, the court-appointed facilitator spent six hours with the litigants, but could not achieve a resolution. On September 27, 2005, the day scheduled for trial, the probate court entered a handwritten order prepared by petitioner's attorney, stating, "This matter is to be scheduled for binding arbitration before a sole arbitrator to be determined by the parties within one week." The signature of respondent's attorney appears on the order, next to the word "Approved." The parties agree that no transcript exists documenting their positions regarding the planned arbitration. Neither party ever filed an objection to arbitration,

---

[2] Vlado and Vesna lived with respondent, respondent's wife, and respondent's family for 27 years.

and neither sought to revoke the agreement before the arbitrator rendered a decision.

The arbitration commenced on November 29, 2005, and extended through three days. The parties presented witnesses and submitted written closing arguments. Patricia Gormely Prince, the parties' chosen arbitrator, later prepared a detailed "Arbitration Decision and Award," finding that "Vlado was subject to undue influence and was not competent to make a Will." Prince similarly concluded that Vlado's lack of capacity warranted the setting aside of the two quitclaim deeds Vlado signed in April 2001 and a power of attorney that Vlado signed in 2000. Prince also determined that MCL 700.2101 and MCL 700.2103 required that Vlado's estate be equally divided between petitioner and respondent. Prince recommended that the parties bear "their own attorney fees" and that no fees be charged to Vlado's estate.

On May 31, 2006, respondent filed in the probate court "Objections to Certain Provisions" of the arbitration decision, which contested only the portions of the ruling involving Vlado's real property and the power of attorney Vlado signed in 2000. In support of those objections, respondent invoked MCL 600.5005 and *McFerren v B & B Investment Group*, 233 Mich App 505; 592 NW2d 782 (1999). On the same day, respondent filed a "Supplemental Objection" to the entire arbitration decision and award, insisting that, as reflected by the Michigan Supreme Court's analysis in *In re Meredith Estate*, 275 Mich 278; 266 NW 351 (1936), the probate court lacked the authority to refer to arbitration the parties' estate-based dispute concerning Vlado's testamentary capacity. The probate court confirmed the arbitrator's decision "in its entirety [sic]," and this appeal ensued.

II. ANALYSIS

A. THE AGREEMENT TO ARBITRATE

Respondent contends that because the parties did not have a written arbitration agreement, the probate court erred by adopting the arbitrator's award. Respondent failed to raise this issue in the probate court. "Generally, an issue not raised before and considered by the trial court is not preserved for appellate review." *Adam v Sylvan Glynn Golf Course*, 197 Mich App 95, 98; 494 NW2d 791 (1992). However, because "the question is one of law and the facts necessary for its resolution have been presented," we choose to review respondent's contention. *Id.* at 98-99.

In a document filed in the probate court entitled "Response to Petition for Entry of Order Upon Breach of Contract," respondent admitted that the probate court entered a stipulated order for arbitration. This Court has recognized that stipulations are "a type of contract . . . ." *Limbach v Oakland Co Bd of Co Rd Comm'rs*, 226 Mich App 389, 394; 573 NW2d 336 (1997). "Stipulated orders that are accepted by the trial court are generally construed under the same rules of construction as contracts." *Phillips v Jordan*, 241 Mich App 17, 21; 614 NW2d 183 (2000).

The stipulated order involved here unambiguously provides that "[t]his matter is to be scheduled for binding arbitration before a sole arbitrator to be determined by the parties within one week." Moreover, by voluntarily participating in the arbitration process without objection, respondent waived the issue whether the parties had entered into a valid agreement to arbitrate. *American Motorists Ins Co v Llanes*, 396 Mich 113, 114; 240 NW2d 203 (1976). "[A] party may not participate in an arbitration and adopt a 'wait and see'

posture, complaining for the first time only if the ruling on the issue submitted is unfavorable." *Arrow Overall Supply Co v Peloquin Enterprises*, 414 Mich 95, 99-100; 323 NW2d 1 (1982). We thus reject as factually and legally unfounded respondent's claim that the parties lacked a written arbitration agreement.

Respondent next challenges the arbitrator's ruling as violative of MCL 700.1302, pursuant to which the probate court possesses exclusive jurisdiction over estate-related disputes. We review de novo "a trial court's determination that an issue is subject to arbitration . . . ." *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 152; 742 NW2d 409 (2007).

Respondent's jurisdictional argument rests primarily on *In re Meredith Estate*. According to respondent, *In re Meredith Estate* compels a conclusion that despite the parties' stipulation to submit their dispute to arbitration, they could not properly agree to "supersede" the probate court's statutorily vested responsibility to determine Vlado's testamentary capacity. Respondent therefore suggests that the probate court lacked authority to adopt the arbitrator's decision. Petitioner concedes that § 1302 invests the probate court with "exclusive legal and equitable jurisdiction" regarding all matters relating to a decedent's estate, but argues that this jurisdictional exclusivity does not limit the probate court's power to enforce a common-law arbitration agreement. Petitioner further asserts that MCR 5.143(A) specifically authorizes the probate court to employ methods of alternative dispute resolution and that the jurisdictional limitations deemed critical in *In re Meredith Estate* no longer apply. Because the parties argue at length concerning the interpretation and application of *In re Meredith Estate*, we now turn to a careful examination of that decision.

The decedent in *In re Meredith Estate* executed his will in March 1932, naming the Detroit Trust Company and James O. Murfin as his executors and trustees. *In re Meredith Estate, supra* at 284. In August 1934, the decedent executed a codicil that named Frederick W. Campbell as an additional executor and trustee, but did not otherwise alter any aspects of the will. *Id.* After the decedent died in December 1934, Murfin petitioned for the admission of the will to probate, and Campbell petitioned to admit the codicil. *Id.* at 284-285. At a probate court hearing, Murfin testified that the decedent's doctors had advised Murfin that the decedent "was mentally incompetent to transact business when" he executed the codicil. *Id.* at 285. The decedent's housekeeper expressed her belief that "Mr. Meredith knew what he was doing" when he executed the codicil, and that his doctor had examined him before he executed it. *Id.*

Campbell and Murfin agreed "in open court to submit the question of the mental competency of the testator to a leading Detroit attorney." *Id.* The attorney interviewed witnesses and concluded that the decedent lacked "sufficient testamentary capacity to make and execute the codicil . . . ." *Id.* The probate court admitted the will to probate, but rejected the codicil. *Id.* at 286. Campbell appealed, arguing that because the probate of a will or codicil constituted an in rem proceeding, it was not subject to common-law arbitration. *Id.* at 287.

The Michigan Supreme Court considered whether the executors possessed the authority to submit the question of the testator's mental capacity to ascertainment by a third party. The Supreme Court commenced its analysis by observing, "The rule is firmly settled in this State that estates of deceased persons may be settled between all those interested competent to con-

tract without the intervention of the probate court." *Id.*
at 290. However, the Supreme Court noted, "That
question is not here." *Id.* Rather, the Supreme Court
explained, "The only question is who shall act as
executor of his last will and testament which includes
the original instrument and any legal codicils thereto
duly admitted to probate." *Id.* The Supreme Court
further demarcated the scope of its analysis as follows:
"Assuming there was an agreement between the execu-
tors named in the will and the executor named in the
codicil, the question is whether *they* had any power or
authority to agree in open court to submit the question
of the mental competency of the testator to a third
person for determination." *Id.* (emphasis added).

The Supreme Court reasoned as follows that the
probate court had erred by adopting the arbitrator's
decision:

> The statutes contemplate a hearing before the probate
> court and a determination by the probate court of the
> testamentary capacity of the testator. Under the statute,
> notice of the time and place of proving the will and the
> codicil must be given and this notice is usually given by
> publication to all persons interested, and the date fixed by
> such notice is "when all concerned may appear and contest
> the probate of the will." No order or rule of court named
> [the third-party attorney] as the person before whom
> testimony in relation to the mental competency of the
> testator was to be taken and the testimony, if any adduced,
> was not taken before him by deposition. [*Id.* at 290-291
> (citations omitted).]

Manifestly, the Supreme Court premised its decision in
*In re Meredith Estate* on the language of the probate
statutes then in existence. The following statements in
the opinion underscore our conclusion that in reaching
its decision, the Supreme Court in *In re Meredith Estate*

relied exclusively on the provisions of the 1929 Michigan Compiled Laws governing probate proceedings:

> The sole authority to pass upon the testamentary capacity of the testator *is vested by statute* in the probate court. . . .
>
> Parties cannot by agreement supersede the *essential regulations made by law* for the investigation of causes, and by stipulation set aside *the statutory method* prescribed for determining the mental capacity of the testator.
>
> The right to contest a will is, in this State, purely statutory and can be exercised only in accordance with and within *the limitations prescribed by statute*. [*Id.* at 291-292 (citations omitted; emphasis added).]

The Supreme Court further observed in *In re Meredith Estate* that "[t]he legatees and beneficiaries under the trusts created by the will are not here" and "[t]here is nothing upon the face of the order which indicates it was an order entered by consent." *Id.* at 294, 296. Consequently, the executors and trustees of the decedent's estate had

> no such interest in the estate as to permit them to agree to submit the testamentary capacity of testator to a third person for determination. Their agreement could not bind those who have a pecuniary interest in the estate. *No agreement of this kind under any circumstances could bind the estate unless all persons interested therein were parties thereto.* [*Id.* at 294 (emphasis added).]

The Supreme Court in *In re Meredith Estate* thus held that executors or trustees may not agree to arbitrate the competency of a testator. In obiter dictum, the Supreme Court added:

> No stipulation such as here involved can oust the jurisdiction of the probate court, permit the probate judge to abdicate his jurisdiction and power or delegate it to a third person not a judicial officer, and no stipulation can

provide for the determination of the status of the codicil in any other manner than that provided by statute. Jurisdiction to determine the competency of the testator may not be conferred by agreement on a third person. [*Id.* at 297.]

Several conclusions reached by the Supreme Court in *In re Meredith Estate* derive from its unique facts. The arbitration conducted by the "leading Detroit attorney" proceeded informally, without notice to or involvement of all interested parties or the administration of oaths to witnesses. *Id.* at 285, 291. Murfin and Campbell neglected to agree in advance whether the arbitration would be binding. *Id.* at 295. These procedural deficiencies undoubtedly fueled the Supreme Court's condemnation of the use of arbitration under the circumstances presented in that case. *Id.* at 295-298.

But the procedures utilized in this case differ markedly from those described in *In re Meredith Estate*. Here, all interested parties agreed to submit their dispute to binding arbitration. Counsel for the parties entered into a written stipulation for binding arbitration, and the arbitrator held a hearing during which she placed witnesses under oath. These distinctions are highly significant and render *In re Meredith Estate* inapplicable. However, because of the broad nature of the Michigan Supreme Court's critical pronouncements regarding the arbitrability of any probate dispute, we must now consider whether the current state of the law in Michigan allows for resolution of probate litigation through binding arbitration.

During the more than 72 years that have elapsed since the Michigan Supreme Court announced its decision in *In re Meredith Estate*, our Legislature has enacted three substantial revisions of Michigan's probate laws. When the Supreme Court decided *In re Meredith Estate*, 3 Comp Laws 1929, Chapter LI,

§ 15519 *et seq.*, governed the powers and jurisdiction of the probate courts. During that era, our Supreme Court observed that "[p]robate courts have always been regarded as courts for peculiar and limited purposes, which are outside ordinary litigation, and incapable of dealing completely with ordinary rights." *Burgess v Jackson Circuit Judge*, 249 Mich 558, 563; 229 NW 481 (1930). In 1939, the Legislature enacted a new probate code. 1939 PA 288. In 1978, the Legislature replaced the 1939 probate code with the Revised Probate Code. 1978 PA 642. Neither the older probate codes nor the Revised Probate Code furnished the probate court with general equitable powers. *Van Etten v Manufacturers Nat'l Bank of Detroit*, 119 Mich App 277, 282-283, 287; 326 NW2d 479 (1982). However, when the Legislature enacted the Revised Probate Code, it unquestionably expanded the powers of the probate courts by contemporaneously enacting MCL 600.847, which provides as follows:

> In the exercise of jurisdiction vested in the probate court by law, the probate court *shall have the same powers as the circuit court to hear and determine any matter and make any proper orders* to fully effectuate the probate court's jurisdiction and decisions. [Emphasis added.]

In 1998, our Legislature enacted the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, which took effect in April 2000. EPIC confers on probate courts the "exclusive legal and equitable jurisdiction" of matters that "relate[] to the settlement of a deceased individual's estate . . . ." MCL 700.1302(a). Section 1303(1) of EPIC provides the following:

> In addition to the jurisdiction conferred by section 1302 and other laws, the court has concurrent legal and equitable jurisdiction to do all of the following in regard to an estate of a decedent . . . :

(a) Determine a property right or interest.

(b) Authorize partition of property.

(c) Authorize or compel specific performance of a contract in a joint or mutual will or of a contract to leave property by will.

In addition to expanding the probate court's powers, the Legislature crafted EPIC as a user friendly code, with provisions designed to reduce court involvement in trusts and estates. For example, MCL 700.1303(3) states:

> The underlying purpose and policy of this section is to simplify the disposition of an action or proceeding involving a decedent's, a protected individual's, a ward's, or a trust estate by consolidating the probate and other related actions or proceedings in the probate court.

The Legislature additionally instructed that all of EPIC

> shall be liberally construed and applied to promote its underlying purposes and policies, which include all of the following:
>
> (a) To simplify and clarify the law concerning the affairs of decedents, missing individuals, protected individuals, minors, and legally incapacitated individuals.
>
>        \* \* \*
>
> (c) To promote a speedy and efficient system for liquidating a decedent's estate and making distribution to the decedent's successors. [MCL 700.1201.]

Significant procedural innovations have accompanied the evolution of the probate court's substantive powers. In 1980, this Court declared that "the general court rules do not apply to the probate court except in those instances where the probate court rules adopt provisions of the general court rules by specific reference." *In re Swanson Estate*, 98 Mich App 347, 350; 296

NW2d 256 (1980). The current Michigan Court Rules contrarily provide that "[p]rocedure in probate court is governed by the rules applicable to other civil proceedings, except as modified by the rules in this chapter." MCR 5.001(A). Thus, the rules of practice in probate courts are now substantially similar to those in the circuit courts.

Along with the Legislature's modernization of probate practice, Michigan's courts have witnessed an expansion in the use and judicial approval of alternative dispute resolution (ADR) procedures. In 1999, this Court observed that "[j]udicial approval of arbitration has broadened and strengthened in recent decades." *Rembert v Ryan's Steak Houses, Inc*, 235 Mich App 118, 128; 596 NW2d 208 (1999). "While our legal system may have had only a lukewarm tolerance for arbitration in the past, it now embraces arbitration as an expeditious, inexpensive, and fair means of dispute resolution." *Hetrick v David A Friedman, DPM, PC*, 237 Mich App 264, 271; 602 NW2d 603 (1999), disapproved on other grounds in *Wold Architects & Engineers v Strat*, 474 Mich 223, 232 n 3; 713 NW2d 750 (2006). In contrast with currently prevailing judicial philosophies regarding ADR, "centuries of judicial hostility to arbitration agreements" previously limited their enforcement. *Scherk v Alberto-Culver Co*, 417 US 506, 510; 94 S Ct 2449; 41 L Ed 2d 270 (1974).[3] The United States Supreme Court observed in *Scherk* that English courts "traditionally considered irrevocable arbitration agree-

---

[3] In *Dean Witter Reynolds, Inc v Byrd*, 470 US 213, 219-220; 105 S Ct 1238; 84 L Ed 2d 158 (1985), the Supreme Court again noted "the judiciary's longstanding refusal to enforce agreements to arbitrate" and Congress's more recent characterization of this attitude as " 'an anachronism of our American law' " deriving from " 'the jealousy of the English courts for their own jurisdiction . . . .' " *Id.* at 220 n 6 (citation omitted).

ments as 'ousting' the courts of jurisdiction, and refused to enforce such agreements for this reason." *Id.* at n 4.

In *In re Meredith Estate, supra* at 297, the Supreme Court suggested in obiter dictum that arbitration would divest the probate court of its rightful jurisdiction: "No stipulation such as here involved can oust the jurisdiction of the probate court, permit the probate judge to abdicate his jurisdiction and power or delegate it to a third person . . . ." This Court rejected a similar jurisdictional argument in *Rooyakker, supra* at 150-152, in which the plaintiffs challenged a circuit court's enforcement of a contractual agreement containing client solicitation and arbitration clauses. The plaintiffs asserted that because the circuit courts have exclusive jurisdiction of claims under the Michigan Antitrust Reform Act (MARA), MCL 445.771, the circuit court erred by referring to arbitration the question whether the client solicitation clause violated MARA. *Rooyakker, supra* at 155. This Court concluded that the circuit court did not err, explaining, "Just because the statute provides jurisdiction to the circuit court, it does not follow that it precludes arbitration. If the Legislature intended to exempt all antitrust actions from arbitration, it could have done so." *Id.* at 156.

We find the logic of *Rooyakker* compelling and reject the notion that arbitration divests a court of its rightful statutory jurisdiction. We agree with the Minnesota Supreme Court's explanation that

> there appears never to have been any factual basis for holding that an agreement to arbitrate "ousted" jurisdiction. It has no effect upon the jurisdiction of any court. Arbitration simply removes a controversy from the arena of litigation. It is no more an ouster of judicial jurisdiction than is compromise and settlement or that peculiar offspring of legal ingenuity known as the covenant not to sue.

Each disposes of issues without litigation. One no more
than the other ousts the courts of jurisdiction. The right to
a jury trial, even in a criminal case, may be waived. So, also,
may the right to litigate be waived. Such waiver may be the
result of contract or unilateral action. [*Park Constr Co v
Independent School Dist No 32, Carver Co*, 209 Minn 182,
186; 296 NW 475 (1941).]

See also *Wold Architects & Engineers, supra* at 249
(concurring opinion by CORRIGAN, J.):

> [T]he common-law rule allowing unilateral revocation
> of arbitration agreements is based on the outdated notions
> that arbitration is an unfavorable means of resolving
> disputes and that arbitration ousts the courts of their
> rightful jurisdiction over disputes. The courts are no longer
> jealous of their jurisdiction, and arbitration is now a
> favored method of dispute resolution.

We further observe that when the Supreme Court
decided *In re Meredith Estate*, the common law gener-
ally supported the use of arbitration in will contests.
For example, in two cases predating *Meredith*, *Hoste v
Dalton*, 137 Mich 522, 523-524; 100 NW 750 (1904), and
*Sellers v Perry*, 191 Mich 619; 158 NW 144 (1916), the
Supreme Court upheld agreements removing will chal-
lenges from probate court jurisdiction.[4] Reflective of
this pro-arbitration attitude in the context of probate
disputes is Professor Martin Domke's note, in his
treatise on Commercial Arbitration, that President
George Washington "embodied in his Last Will and
Testament a reference to arbitration by fair-minded
men"; Washington's will provided, in relevant part, as
follows:

---

[4] In *Sellers, supra* at 627, the Supreme Court expressed, "It is, we
think, well settled in this State that legatees under a will, and persons
having such an interest in the estate as to entitle them to contest the
instrument, may make valid agreements to forbear a contest, and such
contracts are favored by the law when made in good faith."

"But having endeavored to be plain and explicit in all the Devises—even at the expense of prolixity, perhaps of tautology, I hope, and trust, that no disputes will arise concerning them; but if contrary to expectation the case should be otherwise from the want of legal expression, or the usual technical terms, or because too much or too little has been said on any of the devises to be consonant with law, my will and direction expressly is, that all disputes (if unhappily any should arise) shall be decided by three impartial and intelligent men, known for their probity and good understanding; two to be chosen by the disputants, each having the choice of one, and the third by those two—which three men thus chosen shall, unfettered by Law, or legal constructions, declare their sense of the Testator's intention; and such decision is, to all intents and purposes, to be binding on the Parties as if it had been given in the Supreme Court of the United States." [1 Domke, Commercial Arbitration (3d ed), § 16.6 p 16-36 (2008 update).]

Despite the Michigan Supreme Court's rejection of the particular probate arbitration conducted in *In re Meredith Estate*, other precedent supports the proposition that our Supreme Court has approved of and accepted properly conducted common-law arbitration in probate matters. In *Hoste, supra* at 523, the widow and children of the deceased "entered into a written agreement by which they settled a pending contest of the will" of the decedent. The arbitration agreement provided, " 'If any question should hereafter arise between the parties hereto as to the construction and enforcement of this agreement, the same shall be submitted for decision to this court [the agreement was entitled in the circuit court for the county of Wayne] and its decision shall be final.' " *Id.* at 525. The complainants brought suit to enforce the arbitration agreement, and the circuit court entered a decree in their favor. *Id.* at 523. The defendants contended that the arbitration agreement was invalid because it "ousts the Supreme Court

of jurisdiction." *Id.* at 526. The Supreme Court rejected
this argument, reasoning as follows:

> The agreement under consideration does not oust all
> courts of their jurisdiction. On the contrary, it requires the
> decision of a court of competent jurisdiction, and the only
> court of original jurisdiction. It is true that the agreement,
> by preventing the defeated litigant from reviewing his case
> in the Supreme Court, ousts that court of its jurisdiction.
> That agreement is not prohibited by the foregoing authori-
> ties. [*Id.*]

The Supreme Court concluded, "We think on grounds of
public policy litigants should be encouraged to accept as
final the decisions of courts of original jurisdiction." *Id.*
at 527.

In light of the Michigan Supreme Court's analysis in
*Hoste*, we reject respondent's argument that probate
proceedings inherently lack arbitrability.[5] The Supreme
Court's unconditional acceptance and enforcement of
the arbitration agreement in *Hoste* clearly signals that
even under the probate laws existing 100 years ago,
properly convened and conducted arbitration could re-
solve a will contest.

Moreover, EPIC has eliminated virtually all the re-
strictions that applied to probate court powers in 1936,
when the Supreme Court decided *In re Meredith Estate*.
The aversion to arbitration articulated in *In re
Meredith Estate* must give way to the substantial
changes in the substantive and procedural law govern-
ing probate practice, as well as jurisprudential recogni-

---

[5] On the same basis, we reject the dissent's contention that *In re
Meredith Estate* held that testamentary capacity is *never* arbitrable, or
resides "within the exclusive jurisdiction of the probate court." *Post* at
204-205. The dissent has elected to entirely ignore *Hoste*, as well as the
plain language in *In re Meredith Estate* anchoring that opinion to its
unique facts and the probate statutes then in existence.

tion of the "desirability of arbitration as an alternative to the complications of litigation." *Scherk, supra* at 511 (quotation marks and citation omitted). For example, the current Michigan Court Rules contain several provisions encouraging courts and litigants to utilize ADR. A court rule applicable to the circuit courts, MCR 2.410, addresses ADR procedures in those courts, describing them as "any process designed to resolve a legal dispute in the place of court adjudication," including settlement conferences, case evaluation, domestic relations mediation, "and other procedures provided by local court rule or ordered on stipulation of the parties." MCR 2.410(A)(2). In 2001, our Supreme Court adopted a corresponding probate court rule, MCR 5.143(A), which states, "The court may submit to mediation, case evaluation, or other alternative dispute resolution process one or more requests for relief in any contested proceeding. MCR 2.410 applies to the extent feasible."

In summary, we hold that to the limited extent that *In re Meredith Estate* barred arbitration of probate disputes, that holding lacks continued viability because it has been superseded by more recent legislative developments and intervening changes in the court rules. Further, the central holding of *In re Meredith Estate* lacks applicability here, because all interested parties had notice of the contemplated arbitration, agreed that the arbitration would supply a binding resolution regarding Vlado's testamentary capacity, and actively participated in the arbitration process. Therefore, *In re Meredith Estate* does not preclude the instant parties from conducting binding common-law arbitration of probate disputes, including the question of testamentary capacity.[6]

---

[6] We emphasize that, contrary to the allegations made by the dissent, our holding in this case neither overrules *In re Meredith Estate* nor

### B. THE QUITCLAIM DEEDS

Respondent next argues that the arbitrator lacked the authority to render any award regarding the quitclaim deeds, which she set aside on the basis of her finding that "Vlado was subject to undue influence and was not competent to transfer property." In support of his argument, respondent invokes MCL 600.5005 and *McFerren*. Petitioner replies that because the parties participated in common-law rather than statutory arbitration, the arbitrator properly considered the distribution of Vlado's real property. Petitioner further asserts that respondent's full participation in the arbitration deprived him of the ability to challenge its scope. We review de novo a circuit court's decision to enforce a statutory arbitration award. *Tokar v Albery*, 258 Mich App 350, 352; 671 NW2d 139 (2003). The existence of a contract to arbitrate and its enforceability constitute judicial questions that we also consider de novo. *Watts v Polaczyk*, 242 Mich App 600, 603; 619 NW2d 714 (2000).

In Michigan, a distinction exists between statutory and common-law arbitration. *Wold Architects & Engineers*, *supra* at 229. The Michigan arbitration act (MAA), MCL 600.5001 *et seq.*, governs statutory arbitration.[7] For an agreement to qualify for statutory arbitration, it must meet the requirements contained in

---

disturbs the rule of stare decisis. *Post* at 205. The facts of the instant case bear no resemblance to those presented in *In re Meredith Estate*, and neither do the controlling statutory authorities. The doctrine of stare decisis lacks applicability when the Legislature has amended the statutory underpinnings of a Supreme Court decision. See *Lamp v Reynolds*, 249 Mich App 591, 604; 645 NW2d 311 (2002), and *People v Pfaffle*, 246 Mich App 282, 303-304; 632 NW2d 162 (2001).

[7] Throughout *Wold Architects & Engineers*, *supra* at 235, the Supreme Court referred to statutory arbitration as being governed by the provisions of "MCL 600.5001 *et seq.*" We thus construe MCL 600.5005, as contained within the MAA.

the statute. *Wold Architects & Engineers, supra* at 229. The statute, MCL 600.5001(1), applies to the arbitration of existing controversies, and provides as follows:

> All persons, except infants and persons of unsound mind, may, by an instrument in writing, submit to the decision of 1 or more arbitrators, any controversy existing between them, which might be the subject of a civil action, except as herein otherwise provided, and may, in such submission, agree that a judgment of any circuit court shall be rendered upon the award made pursuant to such submission.

The arbitration statute "only refers to such agreements as fix upon some designated court in which judgment shall be entered on the award." *McGunn v Hanlin*, 29 Mich 476, 480 (1874). "When the parties' agreement to arbitrate does not comply with the requirements of MCL 600.5001, the parties are said to have agreed to a common-law arbitration." *Wold Architects & Engineers, supra* at 231. "[T]he result of a defective statutory arbitration is a common-law arbitration . . . ." *Whitaker v Seth E Giem & Assoc, Inc*, 85 Mich App 511, 513; 271 NW2d 296 (1978). Because the order submitting the parties' dispute to arbitration did not provide that a judgment could enter in accordance with the arbitrator's decision, this case involves common-law arbitration, to which the statutory arbitration procedures do not apply. *Beattie v Autostyle Plastics, Inc*, 217 Mich App 572, 578; 552 NW2d 181 (1996).

Respondent contends that regardless of whether the arbitration qualified as common-law or statutory, the arbitrator lacked jurisdiction to consider the parties' interests in Vlado's real property. Respondent points out that MCL 600.5005 prohibits submitting to arbitration a dispute involving real estate ownership interests. Additionally, respondent asserts that in *McFerren*, this

Court construed MCL 600.5005 as precluding arbitration of all disputes regarding fee ownership interests in real property.

In *McFerren, supra* at 509-511, this Court held that an arbitrator lacked jurisdiction to decide competing quiet-title claims because of the arbitration prohibition contained in MCL 600.5005:

> A submission to arbitration shall not be made respecting the claim of any person to any estate, in fee, or for life, in real estate, except as provided in Act No. 59 of the Public Acts of 1978, as amended, being sections 559.101 to 559.272 of the Michigan Compiled Laws.[8] However, a claim to an interest for a term of years, or for 1 year or less, in real estate, and controversies respecting the partition of lands between joint tenants or tenants in common, concerning the boundaries of lands, or concerning the admeasurement of dower, may be submitted to arbitration.

However, seven years after this Court decided *McFerren*, our Supreme Court reemphasized in *Wold Architects & Engineers* that common-law arbitration continues to exist in Michigan, not having been preempted by statutory arbitration. According to the Supreme Court, statutory and common-law arbitrations "have long coexisted" in our state, and the MAA includes no provisions evidencing a legislative intent to reform the common law. *Wold Architects & Engineers, supra* at 234. Because "the language of the MAA does not show an intention to abrogate common-law arbitration," the Supreme Court concluded "that the MAA . . . does not occupy the entire area of arbitration law and does not preempt common-law arbitration in Michigan." *Id.* at 234-235. If arbitration agreements do not conform to the MAA, they simply are not enforceable under the MAA. *Id.* at 231. For example, if parties were to

---

[8] Those statutes involve condominiums and do not apply here.

arbitrate a real estate dispute in violation of MCL 600.5005, they could not enforce the award in the circuit court.

If parties wish to conform an agreement to statutory requirements, they must reduce it to writing and include the requirement that a circuit court may enter judgment on the award. "Otherwise, it will be treated as an agreement for common-law arbitration." *Wold Architects & Engineers, supra* at 235. Here, the parties failed to conform their arbitration agreement to the statutory requirements. Accordingly, the common-law arbitration they conducted is not subject to the statutory arbitration requirements or prohibitions. Because the common law does not limit the parties' ability to arbitrate real estate disputes, we reject that MCL 600.5005 precluded arbitration regarding Vlado's capacity to execute the deeds.

The Supreme Court's decision in *Hoste* buttresses our conclusion that MCL 600.5005 does not apply to or restrict a common-law arbitration. The complainants in *Hoste* were married women. *Id.* at 524. The MAA then in effect provided, "All persons, except infants and married women, and persons of unsound mind, may, by an instrument in writing, submit to the decision of one or more arbitrators, any controversy existing between them . . . ." 1897 CL 10924. The defendants argued that the parties' settlement, achieved through arbitration, did not bind them "because complainants, being married women, were incapable of entering into a contract of arbitration." *Hoste, supra* at 524. The Supreme Court rejected this logic, holding, "The arbitration in question was not a statutory arbitration, and therefore the clause in section 10924 of the Compiled Laws of 1897, excepting 'married women' from the persons who may enter into a statutory arbitration, has no application." *Hoste, supra* at 524.

Here, as in *Hoste,* the parties conducted a common-law arbitration. Here, as in *Hoste,* the MAA would have altogether precluded arbitration of the dispute. But because the common law governed the instant parties' arbitration, and not the statute, the heirs remained free to contractually agree to arbitrate whether Vlado possessed the requisite mental capacity when he signed the two quitclaim deeds in April 2001. Although MCL 600.5005 prohibits the submission of certain real estate disputes to statutory arbitration, we hold on the basis of *Wold Architects & Engineers* that § 5005 does not eliminate the parties' ability to arbitrate a real estate dispute under the common law.

### C. THE POWER OF ATTORNEY

Respondent next argues that neither the arbitrator nor the probate court possessed the authority to set aside a power of attorney Vlado executed in 2000. The power of attorney permitted a Macedonian attorney to act on Vlado's behalf with respect to real and personal property Vlado owned in Macedonia. Respondent avers that the probate court lacked jurisdiction to enter an order regarding the Macedonian property or affecting the actions of the foreign attorney.

Respondent premises his argument on quoted material contained in *Niemetta v Teakle,* 210 Mich 590; 178 NW 37 (1920), specifically its holding that a court lacked power "to make decrees affecting property beyond its jurisdiction." *Id.* at 592-593. However, in *Niemetta,* the Supreme Court upheld an equitable order entered by the Wayne Circuit Court regarding property located in Macomb County, explaining, "In view of the fact that all parties were before the court we see no serious barriers in the way which would prevent the Wayne circuit court from com-

pelling an equitable adjustment of the matters involved."
*Id.* at 594.

Contrary to respondent's contention, the probate court in this case did not assume jurisdiction over the Macedonian property. Rather, the arbitrator merely determined that Vlado had become incompetent by January 1, 2000. In light of the arbitrator's finding concerning Vlado's lack of competency, the arbitrator recommended that the probate court set aside the power of attorney Vlado signed in September 2000 and that the foreign property be considered an asset of the probate estate unless it had been transferred before January 1, 2000. We conclude that the probate court correctly determined that it possessed the authority to set aside the power of attorney.

### D. THE SCOPE OF THE ARBITRATION

Respondent additionally contends that the arbitrator exceeded the scope of the arbitration agreement by considering whether Vlado lacked testamentary capacity before the date that he executed the will and the deeds. Although respondent failed to raise this issue in the probate court, we nonetheless will address it because the argument involves a legal question and the facts necessary for its resolution appear in the record. *Adam*, *supra* at 98-99.

A three-part test applies for ascertaining the arbitrability of a particular issue: "1) is there an arbitration agreement in a contract between the parties; 2) is the disputed issue on its face or arguably within the contract's arbitration clause; and 3) is the dispute expressly exempted from arbitration by the terms of the contract." *Detroit Automobile Inter-Ins Exch v Reck*, 90 Mich App 286, 290; 282 NW2d 292 (1979). This Court has expressed a general disapproval of segregating

disputed issues "into categories of 'arbitrable sheep and judicially-triable goats'." *Id.* at 289. "Any doubts about the arbitrability of an issue should be resolved in favor of arbitration." *Huntington Woods v Ajax Paving Industries, Inc (After Remand)*, 196 Mich App 71, 75; 492 NW2d 463 (1992).

The parties' stipulation, which constituted their arbitration agreement, described the scope of the contemplated arbitration simply as "[t]his matter." The "matter" pending before the probate court involved the distribution of Vlado's entire probate estate, not merely selected assets. Petitioner's March 2004 petition alleged that "[f]rom 1999 to the time of his death, Vlado Nestorovski did not have the mental capacity, ability, or power to understand the nature, character, effect and extent of his property." Vlado's testamentary capacity to execute the power of attorney plainly falls within the broad scope of the matters presented in the case. Respondent's failure to lodge in the probate court an objection to the arbitrator's consideration of the power of attorney further suggests that the parties understood this issue to fall within the scope of the parties' arbitration agreement. Because the basic arbitrability requirements exist in this case, we find that the arbitrator properly considered Vlado's capacity to execute the 2000 power of attorney.

Respondent lastly complains that the arbitrator exceeded her authority by deciding that both parties should bear their own attorney fees and that none of the fees should be chargeable to the estate. Respondent maintains that MCL 700.3720 requires that the estate pay his attorney fees. According to MCL 700.3720, "[i]f a personal representative or person nominated as personal representative defends or prosecutes a proceeding in good faith, whether successful or not, the personal

representative is entitled to receive from the estate necessary expenses and disbursements including reasonable attorney fees incurred." "[W]here the fiduciary was partially to blame for bringing about unnecessary litigation, the fiduciary rather than the estate should be responsible for the attorney's fees." *In re Valentino Estate*, 128 Mich App 87, 95-96; 339 NW2d 698 (1983). Given the arbitrator's well-supported finding that respondent exerted undue influence on Vlado, we conclude that MCL 700.3720 does not apply here because respondent did not defend the April 2001 will "in good faith."

Affirmed.

BORRELLO, J. concurred.

SAAD, C.J. (*dissenting*).

### I. INTRODUCTION

The precise issue litigated in *In re Meredith Estate*, 275 Mich 278; 266 NW 351 (1936) is the arbitrability of testamentary capacity; the Michigan Supreme Court in *Meredith* concluded that testamentary capacity is not arbitrable. In all material respects, an identical issue is presented to the Court, because we are asked to decide whether the parties' agreement to arbitrate Vlado Nestorovski's testamentary capacity is enforceable. Because we are bound by the principle of stare decisis embodied both in our jurisprudential history and in specific holdings from our highest court, *Meredith*'s holding must control. Until our Supreme Court modifies its own precedent, the rule in this jurisdiction is that testamentary capacity is not arbitrable. Therefore, I respectfully dissent from the majority's departure from *Meredith*'s holding.

## II. NATURE OF THE CASE

The underlying issue before the trial court was the testamentary capacity of the testator, Vlado Nestorovski. The key issue on appeal is whether testamentary capacity is subject to binding arbitration or is within the exclusive jurisdiction of the probate court. Because our Supreme Court ruled in *Meredith* that testamentary capacity is not arbitrable, the issue upon which the majority and I disagree is whether our Court, as an intermediate appellate court, may overrule *Meredith* on the basis of our belief that the Michigan Supreme Court would overrule *Meredith* if faced with the question today.

Because *Meredith* is binding on all inferior courts, including this Court, I respectfully disagree with the majority that we have the authority to rule contrary to *Meredith* simply because we believe that the Supreme Court would overturn its precedent in light of legislative, court rule, and decisional law developments.

Though I agree that the Michigan Supreme Court would overrule *Meredith* if faced with this precise issue today, the law that governs our authority as an inferior court precludes this Court from taking this action. Indeed, it is quite clear that Michigan Supreme Court precedent that is binding on this Court does not permit an inferior court, appellate or trial, to overrule Supreme Court precedent; rather, such precedent places the prerogative of overruling Supreme Court decisions with the Supreme Court.

Accordingly, because *Meredith* is "good law" until our Supreme Court rules that it is not, we are bound by Supreme Court precedent that clearly and unequivocally mandates that we follow its precedents and leave the business of overruling Supreme Court decisions to the Supreme Court.

### III. FACTUAL RELATIONSHIP TO *MEREDITH*

The majority paradoxically contends that *Meredith* is both a fact-specific holding unintended for extension and a "critical pronounce[ment] [of] the arbitrability of *any* probate dispute . . . ." *Ante* at 188 (emphasis added). It is, in fact, neither. The issue before the court in *Meredith* was narrow, and so too was its holding. Indeed, *Meredith* addressed the discrete issue whether testamentary capacity is arbitrable and it clearly and narrowly held that it is not. Because the arbitrability of testamentary capacity is precisely the issue before the Court today, our decision must be constrained by the Michigan Supreme Court's ruling in *Meredith*.

### IV. ANALYSIS

Michigan Supreme Court precedent precludes our Court from overruling decisions of the Michigan Supreme Court. In *People v Mitchell*, 428 Mich 364; 408 NW2d 798 (1987), our Supreme Court admonished this Court for failing to adhere to its earlier holding that an unsigned search warrant lacked validity. The Court made clear that the impropriety lies not in reaching the incorrect conclusion, but in overruling the Supreme Court:

> Although the Court of Appeals panel in this case *correctly anticipated our holding,* we disapprove of the manner in which the panel indicated its disagreement . . . . An elemental tenet of our jurisprudence, stare decisis, provides that a decision of the majority of justices of this Court is binding upon lower courts. [*Id.* at 369 (emphasis added).]

Similarly, I believe that the majority "correctly anticipates" the Supreme Court's ruling, but incorrectly oversteps its authority in doing so.

Recently, our Supreme Court reaffirmed its holding in *Mitchell* and reiterated the importance of vertical stare decisis. In *Boyd v W G Wade Shows*, 443 Mich 515; 505 NW2d 544 (1993), overruled on other grounds in *Karaczewski v Farbman Stein & Co*, 478 Mich 28 (2007), the Michigan Supreme Court reversed this Court's holding that the necessity to abide by the Supreme Court's ruling in *Roberts v I X L Glass Corp*, 259 Mich 644; 244 NW 188 (1932), was obviated by post-decision amendment of the statute to which *Roberts* related.[1] Unequivocally asserting exclusive authority to overrule its decisions, the Michigan Supreme Court again held that "it is the Supreme Court's obligation to overrule or modify case law if it becomes obsolete, and *until this Court takes such action, the Court of Appeals and all lower courts are bound by that authority*." *Boyd, supra* at 523 (emphasis added), citing *Edwards v Clinton Valley Ctr*, 138 Mich App 312; 360 NW2d 606 (1984); *McMillan v Michigan State Hwy Comm*, 130 Mich App 630; 344 NW2d 26 (1983), rev'd in part on other grounds 426 Mich 46 (1986); *Ratliff v Gen Motors Corp*, 127 Mich App 410; 339 NW2d 196 (1983); *Schwartz v City of Flint (After Remand)*, 120 Mich App 449; 329 NW2d 26 (1982), rev'd on other grounds 426 Mich 295 (1986). Our Supreme Court in *Boyd* further noted:

---

[1] In support of the proposition that post-decision amendments of statutes on which higher court decisions are predicated can warrant departure from the doctrine of stare decisis, the majority cites *People v Pfaffle*, 246 Mich App 282, 303-304; 632 NW2d 162 (2001), and *Lamp v Reynolds*, 249 Mich App 591, 604; 645 NW2d 311 (2002). For reasons clearly set forth in this dissent, the Court in *Pfaffle* cited no authority to support such a theory. In *Lamp*, the Court, like the majority here, cited cases in support of its holding. However, each of those cases discusses the circumstances under which it is proper for the Michigan Supreme Court, not an intermediate appellate court, to overrule *its own* precedent.

> While the Court of Appeals may properly express its belief that a decision of this Court was wrongly decided or is no longer viable, *that conclusion does not excuse the Court of Appeals from applying the decision to the case before it. Because this Court has never overruled* Roberts, *it remains valid precedent.* [*Boyd, supra* at 523 (citations omitted; emphasis added).]

The United States Supreme Court has issued the same mandate to inferior federal courts. Though not binding on our state's jurisprudence, the United States Supreme Court has ruled that only it, and not intermediate appellate courts, may overrule United States Supreme Court precedent. This decision underscores the important foundational nature of vertical stare decisis. In *Rodriguez de Quijas v Shearson/American Express, Inc*, 490 US 477; 109 S Ct 1917; 104 L Ed 2d 526 (1989), the Court analyzed an issue similar to the one before us. While the Court in *Rodriguez, id.* at 480, ultimately agreed with the United States Court of Appeals for the Fifth Circuit that the well-known case of *Wilko v Swan*, 346 US 427; 74 S Ct 182; 98 L Ed 168 (1953) (restricting the arbitrability of certain securities matters) should be overruled because the "judicial hostility to arbitration" present at *Wilko*'s issuance "has been steadily eroded over the years," the Supreme Court determined that it was nonetheless improper for the Court of Appeals to ignore the precedent:

> We do not suggest that the Court of Appeals on its own authority should have taken the step in renouncing *Wilko*. If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions. [*Rodriguez, supra* at 484.]

Finally, while the degree of adherence to principles of stare decisis varies among our sister states, the great majority of state courts clearly hold that lower courts lack the authority to ignore what they perceive as outmoded precedent.[2] The reasons underlying the judiciary's commitment to stare decisis are readily apparent and are absolutely essential to our jurisprudence. Clearly, predictability and the rule of law would be undermined if lower courts could simply contravene established precedent, even for what appear to be good reasons. As explained in a recent law review article:

> Serious rule of law costs would follow if lower courts were free to ignore precedent established by a higher court of appeal. At the same time, the appellate process itself substantially mitigates the costs of adhering to an erroneous precedent, because it can always be addressed by the court of last resort. Thus, maintaining vertical stare decisis imposes few costs in terms of popular sovereignty and provides maximal rule of law benefits. [Lash, *Originalism, popular sovereignty, and reverse stare decisis*, 93 Va L R 1437, 1454 (2007).]

Moreover, to ignore the rule of stare decisis would inevitably grant to all lower courts, including trial courts, the authority to circumvent higher court rulings under the guise of anticipating that the higher court will change its position. This is a very dangerous, slippery slope. For these reasons, our Supreme Court and the United States Supreme Court have held that, even when a lower court correctly anticipates an overruling decision by the higher court, the inferior court

---

[2] See, e.g., *State v Fornof*, 218 Ariz 74, 76; 179 P3d 954 (Ariz App, 2008); *State v Benton*, 168 Ga App 665, 667; 310 SE2d 243 (1983); *State ex rel Martinez v City of Las Vegas*, 135 NM 375, 381-382; 89 P3d 47 (2004); *Cannon v Miller*, 313 NC 324; 327 SE2d 888 (1985); *Fisher v Westmont Hospitality*, 935 SW2d 222, 224 (Tex App, 1996); *Roadcap v Commonwealth*, 50 Va App 732, 742-743; 653 SE2d 620 (2007).

must nonetheless leave the business of overturning Supreme Court precedent to the Supreme Court. Simply stated, "we cannot render decisions based on speculation regarding what the current membership of the Supreme Court may decide." *Roberts v Titan Ins Co (On Reconsideration)*, 282 Mich App 339, 353; 764 NW2d 304 (2009).

V. CONCLUSION

*Mitchell* and *Boyd* prohibit intermediate appellate courts from overturning higher court precedent. These holdings and principles apply, of course, with equal force to trial courts' obligation to conform to established precedent. *Mitchell* and *Boyd* clearly prohibit intermediate appellate courts from overruling Supreme Court precedent, even when the intermediate appellate court, as here, correctly anticipates that the Supreme Court would overrule its earlier ruling. *Mitchell, supra* at 369; *Boyd, supra* at 523. Therefore, the majority is without power or authority to overrule *Meredith*. Though the majority strains to justify its holding by tracing the "evolution" of the probate code and our courts' increasing approval of arbitration, it cites no legal authority that has changed the *Meredith* holding that testamentary capacity is not arbitrable. As much as the majority would like to distinguish or dilute the unequivocal holding of *Meredith* because it disagrees with its current viability, such attempts are unavailing. As our Supreme Court made clear in *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), the Supreme Court may revisit its *own* decisions from time to time, yet it is equally clear, and dispositive here, that only the Supreme Court may do so. *Id*. And it hardly advances proper jurisprudence for our Court to overrule Supreme Court precedent while claiming not to do so. I believe it is imprudent for this Court to arrogate to itself powers it does not have.

For these reasons, I respectfully dissent from the majority's opinion and I would reverse the probate court's order that affirmed the arbitration award.