HALL v STARK REAGAN, PC

Docket No. 294647. Submitted January 4, 2011, at Detroit. Decided September 13, 2011, at 9:00 a.m. Reversed in part and vacated in part, 493 Mich 903.

Patrick C. Hall and Ava Ortner brought an action in the Oakland Circuit Court against Stark Reagan, P.C., and several present and former shareholders in the law firm, alleging age discrimination. Plaintiffs served as shareholders in the firm from 2004 until their termination in 2009. Defendants moved for summary disposition, contending that the arbitration provision in the firm's shareholders' agreement barred the action and challenging plaintiffs' capacity to sue under the Civil Rights Act (CRA), MCL 37.2101 *et seq.* The court, John James McDonald, J., agreed that arbitration was required and granted summary disposition in favor of defendants pursuant to MCR 2.116(C)(7). Plaintiffs appealed.

The Court of Appeals *held*:

1. An issue is arbitrable when (1) there is an arbitration agreement in a contract between the parties, (2) the disputed issue is on its face or arguably within the contract's arbitration clause, and (3) the dispute is not expressly exempted from arbitration by the terms of the contract. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, but the presumption of arbitrability cannot compel the arbitration of issues beyond those identified in the parties' contract. The arbitration clause at issue in this case stated that it applied to any "dispute regarding interpretation or enforcement of any of the parties' rights or obligations" under the shareholders' agreement. The agreement embodied the parties' intentions concerning the transfer, purchase, and sale of Stark Reagan stock. Thus, the arbitration language evinced an intent to commit to arbitration those claims stemming from the interpretation or enforcement of matters related to the management of corporate stock. Plaintiffs' age-discrimination claims fell outside the arbitration provision because they bore no significant relationship to the agreement, the agreement did not refer to any issues even tangentially related to the age-discrimination claims, and the agreement provided no evidence pertinent to the age-discrimination claims. Contrary to the circuit court's conclusion, Stark Reagan's law office staff

manual, which prohibited discrimination on the basis of age, did not become part of the shareholders' agreement in light of the fact that the agreement, which was entered after the office manual was created, made no mention of the office manual and contained a clause stating that the shareholders' agreement constituted the entire agreement between the parties.

2. Under MCL 37.2202(1)(a), an employer shall not discriminate against an individual with respect to employment because of age or other protected status. An employer can be held liable under the CRA for discriminatory acts against a nonemployee if it can be demonstrated that the employer affected or controlled a term, condition, or privilege of employment. Defendants indisputably fell within the CRA's definition of "employer." And plaintiffs asserted an adverse employment action and presented evidence that defendants' actions affected or controlled a term, condition, or privilege of their employment. Accordingly, contrary to defendants' assertion, even if plaintiffs could not be characterized as Stark Reagan employees, their pleadings stated a claim under the CRA.

Reversed and remanded.

K. F. KELLY, P.J., dissenting, disputed the majority's application of the relevant law to the facts of the case. The shareholders' agreement specified the procedures and requirements for the involuntary termination of a shareholder's interest in the firm and the process by which the shares could be redeemed. The agreement also stated that it was subject to and governed by Michigan law, which prohibits discrimination on the basis of age, MCL 37.2202(1)(a). Plaintiffs contested the involuntary redemption of their shares in the law firm, an act that was allegedly the result of unlawful discrimination. Plaintiffs' claims could not be maintained without reference to the shareholders' agreement and were inextricably linked with that agreement. Therefore, plaintiffs' claims were within the agreement's arbitration clause and subject to arbitration.

1. ARBITRATION — ARBITRABILITY — PRESUMPTION OF ARBITRABILITY — LIMITATION OF THE PRESUMPTION OF ARBITRABILITY.

An issue is arbitrable when (1) there is an arbitration agreement in a contract between the parties, (2) the disputed issue is on its face or arguably within the contract's arbitration clause, and (3) the dispute is not expressly exempted from arbitration by the terms of the contract; any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, but the presumption of

arbitrability cannot compel the arbitration of issues beyond those identified in the parties' contract.

2. CIVIL RIGHTS — CIVIL RIGHTS ACT — DISCRIMINATION — LIABILITY FOR
DISCRIMINATION AGAINST NONEMPLOYEES.

Under the Civil Rights Act (CRA), an employer shall not discriminate against an individual with respect to employment because of age or other protected status; an employer can be held liable under the CRA for discriminatory acts against a nonemployee if it can be demonstrated that the employer affected or controlled a term, condition, or privilege of employment (MCL 37.2202[1][a]).

*Law Offices of Kathleen L. Bogas, PLC* (by *Kathleen L. Bogas* and *Charlotte Croson*), for Patrick C. Hall.

*Pitt, McGehee, Palmer, Rivers & Golden* (by *Robert W. Palmer* and *Beth Rivers*) for Ava Ortner.

*Kienbaum Opperwall Hardy & Pelton, P.L.C.* (by *Thomas G. Kienbaum* and *Jay C. Boger*), for Stark Reagan, P.C., Peter L. Arvant, Kenneth M. Boyer, William D. Girardot, Christopher E. LeVasseur, R. Keith Stark, and Michael H. Whiting.

*Ahern Fleury* (by *Joseph A. Ahern*) for Joseph A. Ahern and Jeffrey J. Fleury.

Before: K. F. KELLY, P.J., and GLEICHER and STEPHENS, JJ.

GLEICHER, J. The individual parties to this appeal are present and former shareholders in a law firm, defendant Stark Reagan, P.C. Plaintiffs Patrick C. Hall and Ava Ortner filed a complaint against Stark Reagan and the individual defendants, asserting that age discrimination motivated defendants' decision to terminate Hall's and Ortner's shareholder status. The circuit court granted defendants summary disposition pursuant to MCR 2.116(C)(7) and ordered the case to proceed to arbitration. We reverse and remand for further proceedings.

I. UNDERLYING FACTS AND PROCEEDINGS

In 2003, Stark Reagan hired Hall and Ortner as associate attorneys. On January 1, 2004, they became shareholders in the firm, joining seven of the eight attorneys named as individual defendants in this case.[1] Upon their election as shareholders in the firm, Hall and Ortner signed a shareholders' agreement that included an arbitration clause.

At a January 8, 2009 shareholders' meeting, defendant R. Keith Stark proposed the termination of Hall's and Ortner's interests in Stark Reagan. According to affidavits submitted by Hall and Ortner, Stark explained that their terminations were needed "to change the 'demographics' of the firm." The affidavits attested that defendant Joseph Ahern expressed that "the demographics of the firm was [sic] a problem because older attorneys lose their client bases," and that two younger attorneys " 'had more potential' and their practices would be going up while ours would be going down." At the request of Hall and Ortner, the meeting adjourned until the next week. During the continued meeting on January 12, 2009, Ortner and Hall announced that the termination of their employment "constituted illegal age discrimination," and advised the other shareholders that they had retained legal counsel. On February 13, 2009, defendants Ahern and Jeffrey Fleury resigned as shareholders of Stark Reagan, effective immediately. The remaining shareholders voted to redeem the stock held by Hall and Ortner, terminating their employment effective March 1, 2009.

---

[1] In 2005, attorney Daniel E. Chapman was also a shareholder in Stark Reagan. He is not a defendant in this action. Defendant Jeffrey J. Fleury became a shareholder at some point after 2005.

In April 2009, Hall and Ortner filed a three-count complaint in the Oakland Circuit Court alleging that defendants violated the Civil Rights Act (CRA), MCL 37.2101 *et seq.*, by discriminating against them on the basis of their ages, unlawfully retaliating against them when they retained counsel, and conspiring to violate the CRA. Defendants filed a motion for summary disposition under MCR 2.116(C)(7), contending that a binding arbitration agreement barred the lawsuit. Defendants also moved for summary disposition under MCR 2.116(C)(5), challenging the capacity of Hall and Ortner to sue under the CRA. The circuit court entered an opinion and order granting defendants' subrule (C)(7) motion, reasoning as follows:

> The Court finds that the arbitration [sic] is applicable to the case here in all respects. Michigan public policy favors arbitration to resolve disputes. *Rembert v. Ryan's Family Steak Houses, Inc*, 235 Mich.App. 118, 127-128 [596 NW2d 208] (1999). Further, the Shareholder Agreement governs disputes for the shareholders; additionally the Law Office Staff Manual can be said to have become part of the Shareholder Agreement for those who executed that Agreement.[1]
>
> As to the issue of whether Plaintiffs are eligible to bring claims under the Elliott Larsen Civil Rights Act as employees of the law firm, the Court finds that issue is also subject to the arbitration clause. . . .
>
> Accordingly, Defendants' motion for summary disposition pursuant to MCR 2.116(C)(7) is granted and this case is ordered to arbitration. In light of this decision, the Court finds that the other issues raised by defendants are moot here and can be raised before the Arbitrator.

[1] Although not binding on this Court, the holding in *Panepucci v Honigman Miller Schwartz & Cohen* [sic] *LLP*[,] 281 Fed App[x] 482 . . . (C.A. 6 . . . [2008]) is informative.

II. ANALYSIS

A. GOVERNING PRINCIPLES

Hall and Ortner maintain that the arbitration clause in the shareholder agreement does not apply to this dispute arising under the CRA. We review de novo a circuit court's determination that an issue is subject to arbitration. *In re Nestorovski Estate*, 283 Mich App 177, 184; 769 NW2d 720 (2009).

> A three-part test applies for ascertaining the arbitrability of a particular issue: 1) is there an arbitration agreement in a contract between the parties; 2) is the disputed issue on its face or arguably within the contract's arbitration clause; and 3) is the dispute expressly exempted from arbitration by the terms of the contract. [*Id.* at 202 (quotation marks and citation omitted).]

"Arbitration is a matter of contract . . . ." *City of Ferndale v Florence Cement Co*, 269 Mich App 452, 460; 712 NW2d 522 (2006). Under the federal arbitration act (FAA), 9 USC 1 *et seq.*, courts considering whether the parties agreed to arbitrate a certain matter "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc v Kaplan*, 514 US 938, 944; 115 S Ct 1920; 131 L Ed 2d 985 (1995).[2] The United States Supreme Court recently emphasized that although federal policy favors arbitration, "we have never held that this policy overrides the principle that a court may submit to arbitration only those disputes . . . that the parties have agreed to submit. Nor have we held that courts may use policy considerations as a substitute for party agreement." *Granite Rock Co v Int'l Brotherhood of Teamsters*, 561 US ___, ___; 130 S Ct 2847, 2859; 177 L Ed 2d 567 (2010)

---

[2] The parties agree that the FAA applies in this case because Stark Reagan attorneys practice law outside Michigan.

(quotation marks and citations omitted). "[W]hen parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts, if the contract is not contrary to public policy." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 213; 737 NW2d 670 (2007) (quotation marks and citation omitted). " 'The cardinal rule in the interpretation of contracts is *to ascertain the intention of the parties*.' " *Goodwin, Inc v Orson E Coe Pontiac, Inc*, 392 Mich 195, 209; 220 NW2d 664 (1974), quoting *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924). "Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning." *Haywood v Fowler*, 190 Mich App 253, 258; 475 NW2d 458 (1991).

### B. ARBITRABILITY OF HALL'S AND ORTNER'S CLAIMS

We first consider whether the arbitration clause language of the shareholders' agreement governs this action brought under the CRA. Article 14 of the shareholders' agreement, entitled "Miscellaneous Provisions," sets forth, in relevant part, the following with respect to arbitration:

> Any dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder shall be resolved by binding arbitration according to the rules of the American Arbitration Association in the County of Oakland, State of Michigan. The parties hereby irrevocably submit to personal jurisdiction of any State court in the County of Oakland or the Federal court in the County of Wayne, State of Michigan, in any action or other legal proceeding to enforce any award made by the arbitrators. . . .

> ... Proceeding to arbitration and obtaining an award
> thereunder shall be a condition precedent to the bringing
> or maintaining of any action in any court with respect to
> any dispute arising under this Agreement, except for the
> institution of a civil action of a summary nature where the
> relief sought is predicated on there being no dispute with
> respect to any fact.

The arbitration clause clearly and unambiguously declares that it applies to "[a]ny dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder . . . ." By these terms, the arbitration clause limits its scope to disputes relating to the "interpretation or enforcement" of the "rights or obligations" described within the shareholders' agreement.

The shareholders' agreement embodies the parties' intentions concerning the transfer, purchase, and sale of Stark Reagan stock. The 14 articles contained in the shareholders' agreement address: (1) general restrictions on the disposition of stock, (2) the manner in which shareholders may gain admission to the corporation through a vote of other shareholders, (3) the necessary conditions precedent to the sale, transfer, or other disposition of stock, (4) the purchase and sale of stock in the event of a shareholder's inability to practice law because of a disability, (5) the purchase of stock in the event of the death of a shareholder, (6) the redemption of stock in the event of a shareholder's retirement or "Of Counsel" status, (7) involuntary transfers of stock, including but not limited to "transfers pursuant to operation of law, a divorce proceeding, to judicial process and to proceedings in bankruptcy or receivership," (8) the sale of stock on termination of employment, (9) additional events triggering a stock redemption or purchase, (10) the procedural requirements applicable to the purchase of the stock of a selling

shareholder, (11) stock prices and other terms, including the repayment of loans and capital contributions, (12) stock redemption or purchase payment terms, and (13) shareholder guaranties. Article 14 consists of the arbitration terms and other general, standard contractual clauses.

The shareholders' agreement makes no mention of any relationships between the parties other than those created or impacted by the disposition of stock. The "rights or obligations" addressed in the shareholders' agreement involve only various forms of entitlement to stock ownership and restrictions attending stock transfer. The parties' chosen arbitration language clearly and unambiguously evinces an intent to commit to an arbitral forum only those claims stemming from the "interpretation or enforcement" of matters directly related to the management of corporate stock.

Our review of Hall's and Ortner's complaint reveals no allegation that defendants violated a term of the shareholders' agreement or disregarded the procedures for stock redemptions. Hall and Ortner have set forth no assertions touching on the price of their stock, payment terms, the manner of stock disposition, or any other right or obligation described in the shareholders' agreement. Simply put, Hall and Ortner have not advanced any claim or argument germane to the subject matter of the shareholders' agreement, or having its genesis in that agreement. To include an age-discrimination action within the scope of an arbitration provision expressly limited to the "interpretation or enforcement" of "rights or obligations" concerning corporate stock would expand the clause's reach beyond that intended by the parties. Consequently, Hall's and Ortner's age-discrimination claims fall outside the ambit of the arbitration provision.

Defendants insist that the following "Introductory Statements" of the shareholders' agreement compel arbitration of Hall's and Ortner's CRA claims:

> B. The parties hereto believe it is desirable and in their mutual best interest to control the ownership of the Stock of the Corporation and to also insure the continuous, harmonious and effective management of the affairs, policies, and operations of the Corporation; as such, this Agreement is also intended to be construed as an agreement entered into pursuant to §488 of the Michigan Business Corporations Act (as may be amended from time to time) and shall supercede and control any and all provisions of the Corporation's By Laws and Articles of Incorporation that may now or hereafter be in conflict herewith.
>
> C. The parties desire to enter into this Agreement in order, among other things, to establish and implement a structure for the orderly management and operation of the Corporation, to restrict the transfer of all shares of the Stock of the Corporation so that the Stock will not pass into the control of persons whose interests, might be incompatible with the interests of the Corporation and the Shareholders, and to provide a market for the sale of shares upon death or disability of a Shareholder and upon the occurrence of certain other events; all as hereinafter provided.

Despite the references to "the continuous, harmonious and effective management of the affairs, policies, and operations of the Corporation" and "the orderly management and operation of the Corporation," we find nothing in the contract that addresses corporate management or operations beyond the realm of stock-related issues. Moreover, the subsequent arbitration clause specifically confines its reach to the resolution of disputes "regarding interpretation or enforcement of any of the parties' rights or obligations hereunder . . . ."

The "rights or obligations" delineated in the contract bear no relationship to Hall's and Ortner's age-discrimination claims.[3]

In reaching this result, we have remained mindful that under both Michigan and federal law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H Cone Mem Hosp v Mercury Constr Corp*, 460 US 1, 24-25; 103 S Ct 927; 74 L Ed 2d 765 (1983); see also *Amtower v William C Roney & Co (On Remand)*, 232 Mich App 226, 234-235; 590 NW2d 580 (1998). But the presumption of arbitrability cannot compel the arbitration of issues beyond those identified in the parties' written contract. *Amtower*, 232 Mich App at 235. Our construction of the contractual language employed by the instant parties is consistent with the decisions of other courts that have interpreted similar contractual language. In *Seifert v US Home Corp*, 750 So 2d 633, 636-638 (Fla, 1999), the Florida Supreme Court sur-

---

[3] We respectfully disagree with the dissent's contention that because Michigan law governs the shareholders' agreement, we must read into the contract the statutory prohibition of age discrimination, MCL 37.2202(1)(a). We decline to extend by implication the issues the parties unambiguously agreed to arbitrate. To do so would sweep away the bedrock principle that by their chosen words, the contracting parties determined the scope of their arbitration agreement. That the drafters and signers of the shareholders' agreement are lawyers buttresses our conclusion. We further observe that these parties are not ordinary lawyers, but specialists in employment law. They must have known that in *Rembert* a conflict panel of this Court held that arbitration of statutory discrimination claims required "[c]lear notice to the employee that he is waiving the right to adjudicate discrimination claims in a judicial forum and opting instead to arbitrate these claims." *Rembert*, 235 Mich App at 161, citing *Renny v Port Huron Hosp*, 427 Mich 415, 437; 398 NW2d 327 (1986). By its terms, the arbitration clause in the shareholders' agreement confines its reach to "[a]ny dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder . . . ." The dissent's interpretation of this clause eliminates the word "hereunder," a judicial amendment we are unwilling to endorse.

veyed state and federal caselaw interpreting arbitration provisions calling for the arbitration of disputes "arising out of" and "relating to" the contract. The parties in *Seifert* entered into a contract for the construction of a house that called for the arbitration of "[a]ny controversy or claim arising under or related to this Agreement or to the Property . . . ." *Id.* at 635. After the plaintiffs moved in, the air conditioning system "picked up the carbon monoxide emissions" from a car running in the garage, "and distributed them into the house, killing Mr. Seifert." *Id.* The plaintiffs sued the defendant for wrongful death, asserting tort claims for strict liability and negligence. *Id.*

The Florida Supreme Court observed that although some courts have characterized arbitration clauses referring to disputes arising "out of" or "under" the contract as restrictive, the phrase "arising out of or relating to" the contract is often construed as broadening the scope of an arbitration clause. *Id.* at 637. Nevertheless, the court explained that "even in contracts containing broad arbitration provisions, the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause." *Id.* at 638. Citing *American Recovery Corp v Computerized Thermal Imaging, Inc*, 96 F3d 88, 93-94 (CA 4, 1996), the court in *Seifert* announced that "the test for determining arbitrability of a particular claim under a broad arbitration provision is whether a 'significant relationship' exists between the claim and the agreement containing the arbitration clause, regardless of the legal label attached to the dispute (i.e., tort or breach of contract)." *Id.* at 637-638. In *Seifert*, the court found that the facts and allegations pleaded in the complaint asserted negligence in the home's construction, rather

than the violation of any duty set forth in the contract. *Id.* at 640. The court held that the plaintiffs' tort averments did not bear a "significant relationship to the contract," and discerned no intent on the part of the contracting parties to arbitrate tort claims that emerged after the completion of construction. *Id.* at 641-642.

If *Seifert*'s "significant relationship" test represents an approach less deferential to a presumption of arbitrability, the standard adopted in *Fazio v Lehman Bros, Inc*, 340 F3d 386 (CA 6, 2003), exemplifies the other end of the spectrum. In *Fazio*, the plaintiffs' broker misappropriated millions of dollars from his clients. *Id.* at 391. The plaintiffs sued the brokerage firms that had employed the broker, and the defendants moved to compel arbitration on the basis of a contract term calling for arbitration of " '[a]ny controversy arising out of or relating to any of my accounts, to transactions with you for me, or to this or any other agreement or the construction, performance or breach thereof . . . .' " *Id.* at 391-392. The United States Court of Appeals for the Sixth Circuit held that the plaintiffs' fraud claims fell within the scope of the arbitration agreement because "[t]he lawsuit by necessity must describe why [the broker] was in control of the plaintiffs' money . . . . The plaintiffs therefore cannot maintain their action without reference to the account agreements, and accordingly, *this action is covered by the arbitration clauses*." *Id.* at 395. In a subsequent case, the Sixth Circuit described the *Fazio* standard as "whether an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." *NCR Corp v Korala Assoc, Ltd*, 512 F3d 807, 813 (CA 6, 2008) (quotation marks and citation omitted).

Other federal circuit courts of appeal have more directly addressed the language employed in the instant parties' shareholders' agreement. For example, in *Mediterranean Enterprises, Inc v Ssangyong Corp*, 708 F2d 1458, 1464 (CA 9, 1983), the United States Court of Appeals for the Ninth Circuit distinguished the phrase "arising hereunder" from contractual provisions calling for the arbitration of disputes "arising out of and relating to" the contract. "We have no difficulty finding that 'arising hereunder' is intended to cover a much narrower scope of disputes, *i.e.*, only those relating to the interpretation and performance of the contract itself." *Id.* Professor Martin Domke adopted the Ninth Circuit's reasoning in his treatise on Commercial Arbitration, noting that "a clause providing for the arbitration of 'any dispute arising hereunder' means arising under the contract itself and does not cover matters or claims independent of the contract or collateral to it." 1 Domke, Commercial Arbitration (3d ed), § 8:14.[4]

Irrespective which interpretive approach we apply to the shareholders' agreement's clause mandating the arbitration of "[a]ny dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder," we cannot "arguably" construe this language to cover a dispute regarding workplace discrimination. *In re Nestorovski*, 283 Mich App at 202. The shareholders' agreement neither bears a significant relationship to Hall's and Ortner's CRA assertions, nor refers to any issue even tangentially relevant to

---

[4] Although some federal circuit courts of appeal have criticized the analysis advanced in *Mediterranean Enterprises*, at least one court has acknowledged "that 'arising under' may denote a dispute somehow limited to the interpretation and performance of the contract itself." *Sweet Dreams Unlimited, Inc v Dial-A-Mattress Int'l, Ltd*, 1 F3d 639, 642 (CA 7, 1993).

Hall's and Ortner's age-discrimination claims. Bearing in mind the presumption in favor of arbitrability, we decline to stretch the contracual language so far as to encompass statutory civil rights claims. Because the unambiguous language of the arbitration clause plainly limits its application to actions flowing from the entitlements, privileges, duties, and responsibilities attending stock ownership, we discern no factual support for defendants' contention that the parties intended to arbitrate age-discrimination claims.

Pursuant to similar logic, we reject the circuit court's finding that Stark Reagan's Law Office Staff Manual "bec[a]me part of the Shareholder Agreement for those who executed that Agreement." The staff manual commences with the following relevant "INTRODUCTION":

> This Handbook has been prepared and will be kept up-to-date to provide each employee of Stark Reagan, P.C. with information about the Firm's policies and procedures. It is intended to inform you of the Firm's responsibilities to you and to inform you of your responsibilities to the Firm, its clients and your fellow employees of the Firm.

> \* \* \*

> All should understand that the policy statements described herein are not conditions of employment and are subject to change at the discretion of the Firm. These policies are not intended to create, nor are they to be construed to constitute, a contract between this Firm and any of its employees for either employment or the providing of any benefit described in the Handbook. The Board of Directors, from time to time, makes decisions regarding increases or decreases in the staff. Every present and future employee of the Firm has and will continue to have the right, with or without cause, to resign at any time, and the Firm will continue to have the right, with or without cause, to terminate the employment of any employee at any time. . . .

> The provisions of this manual apply to all attorneys, law clerks, legal assistants, the bookkeeper, the office administrator, the secretarial staff, the receptionists and couriers. Some of the provisions of this booklet do not apply to all employees of the Firm, and in those cases we have tried to state clearly to whom the provisions do apply.

The staff manual describes in several paragraphs the "ORGANIZATION AND MANAGEMENT OF THE FIRM," and explains the functions of the executive, personnel, and technology committees. Most of the staff manual content sets forth garden-variety terms and conditions of employment, including "GENERAL OFFICE POLICIES" concerning attendance, outside employment, computers and e-mail, and a host of other similar topics. The staff manual details Stark Reagan's compensation and benefit plans, and contains admonitions against sexual harassment and other "unwelcome conduct" "based upon a person's legally protected status, such as color, race, ancestry, religion, national origin, age, weight, physical handicap, medical condition, disability, marital status, veteran status, or other protected group status in addition to sex." The staff manual does not contain an arbitration clause.

The shareholders' agreement makes no mention of the staff manual. Rather, it includes the following clause under the heading "Entire Agreement":

> This agreement constitutes the entire agreement between the parties regarding its subject matter and supersedes any and all other agreements, negotiations and discussions, either written or oral, of the parties hereto regarding the subject matter of this Agreement. Any such prior written or oral agreements, negotiations and discussions are hereby revoked, cancelled and rescinded.

Given that the parties contemplated that the shareholders' agreement would serve as "the entire agreement between the parties," no record evidence supports the

circuit court's finding that the shareholders' agreement implicitly incorporated within its terms the law office staff manual.

Nor do we accept, as did the circuit court, that the Sixth Circuit's decision in *Panepucci,* 281 Fed Appx at 488, compels us to view the shareholders' agreement "as an umbrella or master agreement in relation to, and thus covering, the Staff Manual."[5] We find *Panepucci* distinguishable from the instant case in several important respects. First, the arbitration term at issue in *Panepucci* commanded a somewhat broader reach than does the arbitration clause in the shareholders' agreement. Panepucci's partnership agreement contained an arbitration clause stating, "In the event of a controversy or claim *arising under or related to* this Agreement or its interpretation, or, in the event of an alleged breach of this Agreement which the partnership or any Partner disputes, the parties shall submit such controversy, claim or dispute to a binding arbitration . . . ." *Id.* at 484 (emphasis altered). Second, Panepucci's complaint alleged that she had been inequitably compensated on a discriminatory basis. Because the partnership agreement set forth the method for compensating partners, the Sixth Circuit held that the dispute fell within the scope of the arbitration clause: "Panepucci's complaint alleges that she was entitled to more compensation than was distributed. That claim clearly requires reference to, and interpretation of, the Partnership Agreement." *Id.* at 487. In contrast with the facts of the instant case, the Sixth Circuit concluded that

_____

[5] We note that the Sixth Circuit did not designate *Panepucci* for publication, and generally considers unpublished decisions as having "little precedential value." *Taxpayers United for Assessment Cuts v Austin,* 994 F2d 291, 295 n 3 (CA 6, 1993).

Panepucci's action simply cannot be maintained without reference to the Partnership Agreement. Even if the agreement deals only with the bare mechanics of compensation, the question of whether the other partners followed those mechanics could be a key factor in deciding whether or not they illegally discriminated against her. The key issue in Panepucci's suit is whether she was paid less and denied work because of illegal discrimination. To determine whether she was paid less will require determining a baseline of how much she should be paid, and that will require reference to the Partnership Agreement. [*Id.* at 487-488.]

In this case, the shareholders' agreement supplies no evidence pertinent to Hall's and Ortner's age-discrimination claims.

Finally, we find entirely unpersuasive defendants' argument that *Panepucci* supports the circuit court's conclusion that the Stark Reagan staff manual should be considered part of the shareholders' agreement. In *Panepucci*, the Sixth Circuit determined that even if the defendants' attorney manual "were a contract, it would still be governed by the arbitration clause." *Id.* at 488. The Sixth Circuit premised this conclusion on language found in *Nestle Waters North America, Inc v Bollman*, 505 F3d 498 (CA 6, 2007). In *Nestle Waters*, the parties "entered into multiple contracts as part of one overall transaction or ongoing relationship." *Id.* at 503. The first contract in the series incorporated an arbitration clause stating that " 'any controversy or claim . . . arising out of this Agreement . . . shall be settled by arbitration . . . .' " *Id.* at 501. A subsequent agreement (the Deed) did not mention arbitration. *Id.* Nestlé Waters North America Inc. filed a declaratory-judgment action in the federal district court after receiving the defendants' petition for arbitration, which relied on language found only in the Deed. *Id.* The Sixth Circuit framed the dispositive question as whether an arbitration clause placed in an earlier contract could

apply "to a dispute arising out of a later agreement, whose execution was required by the first contract." *Id.* at 504. Although Nestlé Waters's complaint lacked any reference to the signed agreements, the Sixth Circuit ruled that because "the proper interpretation of the Deed could not be determined without reference to" the earlier agreement and the parties' ongoing relationship, the dispute fell within the scope of the arbitration clause. *Id.* at 505. The Sixth Circuit emphasized that "the arbitration clause in this case was written into the contract that was executed first and pursuant to which all of the subsequent agreements and documents were executed." *Id.* at 505-506. Notably, the Sixth Circuit acknowledged in *Nestle Waters*, "[W]e have held that an arbitration clause in a later agreement should not be read backward into an earlier agreement merely because the later agreement had a boilerplate 'merger' clause." *Id.* at 504.

The instant arbitration clause appears in a later agreement that both lacks a merger clause and expressly prohibited the incorporation of any "other agreements" within its subject matter. Given the substantial factual differences between this case and *Nestle Waters*, we derive no guidance from the latter. Furthermore, defendants have brought forth no evidence that the Stark Reagan shareholders intended that the contents of the staff manual would be integrated into the shareholders' agreement. In summary, we detect in defendants' cited federal authority no reason to alter our conclusion that the parties' arbitration agreement does not cover Hall's and Ortner's age-discrimination claims.

C. HALL'S AND ORTNER'S STANDING TO BRING CRA CLAIMS

Lastly, defendants contend that we should affirm summary disposition on an alternate ground, that Hall

and Ortner lack standing to sue under the CRA. According to defendants, only "employees" may sue under the CRA, and as shareholders of the firm, Hall and Ortner instead qualify as employers. In considering whether the statutory language of the CRA reflects a legislative intent that partners or shareholders in a law firm are entitled to the protections of the CRA, we bear in mind "[w]ell-established principles [that] guide this Court's statutory construction efforts. We begin our analysis by consulting the specific statutory language at issue." *Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1, 10; 654 NW2d 610 (2002).

> When reviewing matters of statutory construction, this Court's primary purpose is to discern and give effect to the Legislature's intent. The first criterion in determining intent is the specific language of the statute. The Legislature is presumed to have intended the meaning it has plainly expressed, and if the expressed language is clear, judicial construction is not permitted and the statute must be enforced as written. Additionally, it is important to ensure that words in a statute not be ignored, treated as surplusage, or rendered nugatory. Unless defined in the statute, every word or phrase of a statute will be ascribed its plain and ordinary meaning. [*Robertson v Daimler-Chrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002) (citations omitted).]

The relevant portion of the CRA sets forth the following:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [MCL 37.2202(1)(a).]

The CRA defines an "employer" as "a person who has 1 or more employees, and includes an agent of that person." MCL 37.2201(a). A "person" includes "an individual, agent, association, corporation, . . . partnership, . . . or any other legal or commercial entity." MCL 37.2103(g).

Indisputably, defendants fall within the CRA's definition of "employer." Stark Reagan, a corporation and a "person" for purposes of the CRA, has more than one employee. MCL 37.2201(a); MCL 37.2103(g). As Stark Reagan's agents, the individual defendants are also "persons" who employ others. MCL 37.2201(a); MCL 37.2103(g). As employers, defendants face liability under the CRA if they "discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . ." MCL 37.2202(1)(a). Although the CRA does not define the term "individual," "unless a contract or statute provides a different definition, this Court has recognized that the term 'an individual' designates a natural person or a single human being." *People v Haynes*, 281 Mich App 27, 31; 760 NW2d 283 (2008).

When we apply the plain meaning of the word "individual" to the relevant portion of MCL 37.2202(1)(a), we conclude that the statute prohibits employers from discriminating against persons on the basis of age, with respect to "a term, condition, or privilege of employment . . . ." Defendants have not challenged that Hall's and Ortner's age-discrimination claims assert an adverse *employment* action. Alternatively phrased, defendants have not denied that the February 13, 2009 vote of the shareholders concerned "a term, condition, or privilege of" Hall's and Ortner's employment. And even assuming that Hall and Ortner

cannot be characterized as Stark Reagan "employees," we nevertheless find that their pleadings state a claim under the CRA.

In *McClements v Ford Motor Co*, 473 Mich 373, 376; 702 NW2d 166 (2005), amended 474 Mich 1201 (2005), our Supreme Court considered whether a cashier working for AVI Food Systems, which operated three cafeterias at a Ford assembly plant, could maintain a sexual-harassment action against a Ford Motor Company employee. The Supreme Court held that "a worker is entitled to bring an action against a nonemployer defendant if the worker can establish that the defendant affected or controlled a term, condition, or privilege of the worker's employment." *Id.* at 389. Notably, the Supreme Court recognized that "MCL 37.2202 does not state that an employer is only forbidden from engaging in [prohibited] acts against its own employees. . . . [T]o limit the availability of relief under the CRA to those suits brought by an employee against his or her employer is not consistent with the statute." *Id.* at 386. Instead, to merit protection under the CRA, a plaintiff must show "some form of nexus or connection between the employer and the status of the nonemployee." *Id.* The Supreme Court continued:

> [T]he key to liability under the CRA is not simply the status of an individual as an "employee"; rather, liability is contingent upon the employer's affecting or controlling that individual's work status. Accordingly, an employer can be held liable under the CRA for discriminatory acts against a nonemployee if the nonemployee can demonstrate that the employer affected or controlled a term, condition, or privilege of the nonemployee's employment. [*Id.* at 386-387.]

Therefore, even were we to conclude that Hall and Ortner were not employees of Stark Reagan, we interpret the CRA as permitting their age-discrimination

claim against defendants in light of the record evidence that defendants' actions "affected or controlled a term, condition, or privilege" of Hall's and Ortner's employment.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

STEPHENS, J., concurred with GLEICHER, J.

K. F. KELLY, P.J. (*dissenting*). I respectfully dissent. The circuit court properly granted defendants summary disposition pursuant to MCR 2.116(C)(7) and properly ordered the case to proceed to arbitration. I would affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

As noted by the majority, the individual parties to this appeal are present and former shareholders in the law firm of defendant Stark Reagan, P.C. (the firm). Plaintiffs Patrick C. Hall and Ava Ortner first became "of counsel" to the firm in 2003 for a one year trial period to determine if they would become full partners[1] in the firm. At the time, any future participation in the firm was contingent on them becoming full partners. The firm only had full partners, and each partner had equal shares of stock, along with a seat on the Board of Directors.

Plaintiffs became full partners of the firm in 2004, each paying $10,000 in a capital contribution to the firm and signing the 1991 Shareholders' Agreement. In 2005, a new Shareholders' Agreement was executed. A particular purpose of the agreement was to ensure effective management of the firm:

---

[1] The shareholders in Stark Reagan referred to each other as "partners" and I use the term here.

B. The parties hereto believe it is desirable and in their mutual best interest to control the ownership of the Stock of the Corporation and to also *insure the continuous, harmonious and effective management of the affairs, policies, and operations* of the Corporation . . . .

C. The parties desire to enter into this Agreement in order, among other things, to *establish and implement a structure for the orderly management and operation of the Corporation,* to restrict the transfer of all shares of the Stock of the Corporation so that the Stock will not pass into the control of persons whose interests might be incompatible with the interests of the Corporation and the Shareholders, and to provide a market for the sale of shares upon death or disability of a Shareholder and upon the occurrence of certain other events; all as hereinafter provided. [Emphasis added.]

Stock ownership of the firm was divided equally among the partners. All shares were common shares and retained the same voting rights. Each partner served as an officer of the firm; during their five-year tenure with the firm, plaintiffs both held the position of vice president. The managing partner of the firm was elected each year by a vote of the partners. The agreement specifically stated that it was subject to and governed by the laws of the state of Michigan.

In addition to providing for management of the firm by its shareholders, the agreement specified the procedures and requirements for the involuntary termination of a partner's interest in the firm as well as the process by which the shares could be redeemed. And any dispute was to be submitted to arbitration:

14.1 *Arbitration*

Any dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder shall be resolved by binding arbitration according to the rules of the American Arbitration Association in the County of Oak-

land, State of Michigan. The parties hereby irrevocably submit to personal jurisdiction of any State court in the County of Oakland or the Federal court in the County of Wayne, State of Michigan, in any action or other legal proceeding to enforce any award made by the arbitrators. The arbitrators may award attorneys fees to the prevailing party in any arbitration proceeding.

\* \* \*

... Proceeding to arbitration and obtaining an award thereunder shall be a condition precedent to the bringing or maintaining of any action in any court with respect to any dispute arising under this Agreement, except for the institution of a civil action of a summary nature where the relief sought is predicated on there being no dispute with respect to any fact.

In 2008, allegedly because of declining business and revenues, the partners began discussing restructuring of the firm, although they were unable to reach an agreement on how to accomplish the restructuring. On January 8, 2009, the Managing Partner, Keith Stark, proposed downsizing the firm by three attorneys, including partners. As noted by the majority:

According to affidavits submitted by Hall and Ortner, Stark explained that their terminations were needed "to change the 'demographics' of the firm." The affidavits attested that defendant Joseph Ahern expressed that "the demographics of the firm was [sic] a problem because older attorneys lose their client bases," and that two younger attorneys " 'had more potential' and their practices would be going up while ours would be going down." At the request of Hall and Ortner, the meeting adjourned until the next week. During the continued meeting on January 12, 2009, Ortner and Hall announced that the termination of their employment "constituted illegal age discrimination," and advised the other shareholders that they had retained legal counsel. On February 13, 2009, defendants Ahern and Jeffrey Fleury resigned as shareholders of Stark Reagan,

effective immediately. The remaining shareholders voted to redeem the stock held by Hall and Ortner, terminating their employment effective March 1, 2009. [*Ante* at 91 (alteration in original).]

Plaintiffs commenced the instant action alleging violations of the Civil Rights Act (CRA), MCL 37.2101 *et seq*. Defendants moved for summary disposition under MCR 2.116(C)(7), contending that the arbitration provision of the Shareholders' Agreement barred the lawsuit. Defendants also argued that plaintiffs, as shareholders, could not proceed on a claim under the CRA. The circuit court agreed with defendants that summary disposition was required under MCR 2.116(C)(7) and ordered the case to arbitration.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

The existence and enforceability of an arbitration agreement are questions of law that we review de novo. *Michelson v Voison*, 254 Mich App 691, 693-694; 658 NW2d 188 (2003). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he had not agreed to so submit." *Amtower v William C Roney & Co (On Remand)*, 232 Mich App 226, 234; 590 NW2d 580 (1998), quoting *AT&T Technologies, Inc v Communications Workers of America*, 475 US 643, 648; 106 S Ct 1415; 89 L Ed 2d 648 (1986) (quotation marks omitted) (alteration in original). When the language of an arbitration clause is clear and unambiguous, the intent of the parties will be determined according to the plain meaning of the language. However, any ambiguity in the language of an arbitration clause is to be resolved in favor of arbitration:

[C]onsistent with the strong federal policy promoting arbitration, any ambiguity concerning whether a specific

issue falls within the scope of arbitration, such as whether a claim is timely, must be resolved in favor of submitting the question to the arbitrator for resolution. See *AT & T Technologies*, [475 US at 650.] In other words, there is a presumption of arbitrability " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " *Id.*, quoting *United Steelworkers of America v Warrior & Gulf Navigation Co*, 363 US 574, 582-583; 80 S Ct 1347; 4 L Ed 2d 1409 (1960). In [*First Options of Chicago, Inc v Kaplan*, 514 US 938, 945; 115 S Ct 1920; 131 L Ed 2d 985 (1995)], the Court explained that when the parties have a contract that provides for arbitration of some issues, "the parties likely gave at least some thought to the scope of arbitration." Therefore, the law "insist[s] upon clarity before concluding that the parties did not want to arbitrate a related matter." *Id.* [*Amtower*, 232 Mich App at 234-235 (third alteration in original).]

In order to determine whether a contested issue is subject to arbitration, we apply a three-part test: "1) is there an arbitration agreement in a contract between the parties; 2) is the disputed issue on its face or arguably within the contract's arbitration clause; and 3) is the dispute expressly exempted from arbitration by the terms of the contract." *Detroit Auto Inter-Ins Exch v Reck*, 90 Mich App 286, 290; 282 NW2d 292 (1979). "Any doubts about the arbitrability of an issue should be resolved in favor of arbitration." *Huntington Woods v Ajax Paving Indus, Inc (After Remand)*, 196 Mich App 71, 75; 492 NW2d 463 (1992). And finally, "Segregating disputed issues 'into categories of "arbitrable sheep and judicially-triable goats" ' " is generally disapproved. *In re Nestorovski Estate*, 283 Mich App 177, 202-203; 769 NW2d 720 (2009), quoting *Detroit Auto*, 90 Mich App at 289.

III. ANALYSIS

Plaintiffs maintain that the arbitration clause in the Shareholders' Agreement does not apply to their complaint arising under the CRA. I disagree. Pursuant to the three-part test previously set forth, the first and third elements are met: the agreement clearly has an arbitration clause and plaintiffs' claims are not expressly exempted by the terms of the agreement. The relevant question is whether plaintiffs' CRA claims are on their face or arguably within the Agreement's arbitration clause. I would conclude that they are.

The arbitration clause clearly and unambiguously declares that it applies to "[a]ny dispute regarding interpretation or enforcement of any of the parties' rights or obligations hereunder . . . ." (Emphasis added.) The word "any" is defined as " 'every; all.' " *Dep't of Agriculture v Appletree Mktg, LLC*, 485 Mich 1, 8; 779 NW2d 237 (2010), quoting *Random House Webster's College Dictionary* (1997). By its very terms, the agreement is also "subject to" and "governed by" Michigan laws.[2] Plaintiffs allege in their complaint that they were involuntarily terminated because of age discrimination. Because Michigan law prohibits discrimination against an employee on the basis of age, MCL 37.2202(1)(a), the arbitration clause in the agreement clearly applies. Moreover, engaging in illegal discrimination can hardly be said to be conducive to "the continuous, harmonious and effective management" of the firm which is a key purpose of the agreement.

Another issue addressed by the parties in the circuit court and on appeal is the status of the respective

---

[2] "Subject" to means "[u]nder the power of authority of another; owing obedience or allegiance to another." *The American Heritage Dictionary of the English Language, New College Edition* (1981), p 1282. "Governed" by means controlled by the actions and behavior of another. *Id.* at 569.

parties within the firm. Plaintiffs allege that they were employees and that defendants——the firm as well as its individual shareholders—were their employers. Without addressing the merits of plaintiffs' claims, it is clear that this argument will necessitate an examination of the agreement and operation of the firm in order to ascertain the status and rights of the individual shareholders. Plaintiffs' complaint is replete with references to "non-controlling" and "controlling" shareholders. Plaintiffs allege that the individual defendants had the "decisionmaking power" over "non-controlling shareholders" like plaintiffs. Plaintiffs effectively allege that there were "super partners" who made decisions that were "rubber stamped," while plaintiffs and others were relegated to an inferior position within the firm. These facts cannot be determined without reference to how the firm operated and the partners' relationships. The proceedings will necessarily include an examination of plaintiffs' status as shareholders and will, therefore, require a reading and application of the Shareholders' Agreement. The claim that plaintiffs were marginalized as shareholders directly affects their rights and responsibilities under the agreement. The agreement is critically important to the case—not just tangential to it; it is directly intertwined with plaintiffs' claims that they held a lesser interest in the corporation.

Plaintiffs take the position that, because they were fully indemnified of their capital contribution under the agreement and do not raise any claim regarding the *mechanics* of the stock divestiture, the agreement does not apply to what they believe is their separate and distinct claim of age discrimination. I disagree. Though the mechanics of divestiture may have been proper, plaintiffs are challenging the very process and motive that led to the determination to buy out their shares

and divest them of their interest in the corporation. The majority opinion concedes as much by stating that plaintiffs have "filed a complaint against Stark Reagan and the individual defendants, asserting that age discrimination motivated defendants' decision to terminate [their] *shareholder status.*" *Ante* at 90 (emphasis added).

There are two divesture provisions in the agreement applicable to this case. The first, § 8.1(A), concerns termination of employment:

> If a Shareholder who is employed by the Corporation ceases to be employed by the Corporation due to voluntary termination of employment, termination of employment by the mutual consent of the Shareholder and the Corporation, or termination by the unilateral act of the Corporation, such Shareholder shall be deemed to have offered to sell all of his Stock to the Corporation.

And the second, § 9.1, concerns shareholders who are forced out:

> Provided no other Triggering Event is then effective to cause a redemption or purchase hereunder, upon the vote or written consent of seventy-five percent (75%) of the voting power of the then total issued and outstanding Stock of the Corporation and delivery of written notice to such effect to all Shareholders, the Stock of a Shareholder which such vote or consent demands to be sold shall be subject to redemption by the Corporation . . . .

The agreement then sets out the procedural requirements for exercising a buyout, including price and terms. It is, as the majority notes, procedural in nature; however, that does not mean that it is inapplicable to plaintiffs' allegation of age discrimination. If found to be valid, their claim will undoubtedly include relief in the form of lost profits and stock ownership. Ultimately,

plaintiffs are disputing whether defendants had the right to re-claim the shares.

Finally, because the arbitration clause was included in the agreement, the parties obviously gave some thought to the scope of any arbitration. It must be noted that the parties are not unsophisticated lay people; they are highly talented attorneys well versed in employment and contract law. As such, they were fully cognizant of all legal ramifications of the arbitration clause. The arbitration clause specifically refers to "any" dispute and does not exempt actions under the CRA as it does "civil action[s] of a summary nature where the relief sought is predicated on there being no dispute with respect to any fact." The law "insist[s] upon clarity before concluding that the parties did not want to arbitrate a related matter" and applying the presumption of arbitrability, it cannot be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers plaintiffs' complaint. *Amtower*, 232 Mich App at 235 (quotation marks and citation omitted) (alteration in original).

I do not take issue with the law cited by the majority; instead, I merely dispute the majority's application of these particular facts to the relevant law. Distilled to its essence, plaintiffs are contesting the involuntary redemption of shares, which was allegedly the result of unlawful discrimination. The Shareholders' Agreement is inextricably linked to plaintiffs' claims, which cannot be maintained without reference to the agreement. Plaintiffs' claims are, therefore, subject to arbitration. I would affirm the circuit court's order.