NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0130n.06

Case No. 21-1560

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JENNIFER J. NICHOLS, Individually and as Personal Representative of the Estate of Scott C. Nichols, Deceased, and as assignee of Trinity-Health Michigan d/b/a St. Joseph Mercy Port Huron Hospital,

        Plaintiff-Appellant,

v.

STAT RADIOLOGY MEDICAL CORPORATION,

        Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Mar 24, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: MOORE, COLE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. As part of a settlement agreement for a medical malpractice action that plaintiff Jennifer Nichols brought against it, Trinity Health assigned her its right to sue a third party, Stat Radiology ("StatRad"), for indemnification. Nichols exercised that right and brought a separate action against StatRad. She pointed to an indemnity clause found in a credentialing contract between StatRad and Trinity. The problem? That clause covers only indemnification for claims related to credentialing. But Nichols's claim arose out of the medical malpractice claim against Trinity, not StatRad's credentialing. So she has not met the threshold showing that her claim falls within the scope of the indemnity clause. For this reason, we **AFFIRM.**

No. 21-1560, *Nichols v. Stat Radiology Medical Corp.*,

## I.

In January 2014, Scott Nichols was having trouble breathing and felt a burning pain in his chest. That same day, he went to one of Trinity Health's emergency rooms at St. Joseph Mercy-Port Huron to receive treatment. When he arrived, he was sweating, dizzy, and had tingling in his arms. The emergency doctors ran some tests, including a chest CAT scan. The doctors provided him with medical care, but Scott's condition worsened. Three days later, he died of a thoracic aortic aneurysm.

Scott's wife, Jennifer Nichols, sued Trinity in state court alleging the facts above and claiming that Trinity's delayed diagnosis resulted in her husband's death. One of her specific allegations was that a Trinity doctor misread the chest CAT scan. Trinity, however, believed it was not at fault. Instead, it claimed that its physicians relied on a report by a StatRad employee, Dr. Jason Merchant.

Why would Trinity point the finger at StatRad? Because Trinity outsources its radiology services. It contracts with X-Ray Associates of Port Huron P.C. to provide those services. In turn, X-Ray Associates subcontracts with StatRad to perform them. Trinity does not have a direct services contract with StatRad but does have a credentialing agreement with StatRad.

Trinity and StatRad entered this credentialing contract because Trinity wanted to ensure that StatRad's radiologists, who were performing services for Trinity under the subcontract with X-Ray Associates, were properly licensed. (R. 31-6, Credentialing Agreement, PageID 382 ("[Trinity] wishes to have its medical staff rely upon the credentialing and privileging decisions made by [StatRad]" and "[StatRad] shall furnish" the radiology services "in a manner that permits [Trinity] to comply with all applicable" credentialing regulations).) StatRad agreed to have its process for credentialing and privileging meet Trinity's standards. It also agreed that its

radiologists would hold a license recognized by Michigan and that it would provide Trinity with documents related to its compliance with the credentialing standards. The credentialing agreement contains an indemnification provision, which is at issue here.

In the malpractice lawsuit, Nichols had named X-Ray Associates but not StatRad or Dr. Merchant as defendants, and she did not bring a negligent credentialing claim against Trinity or StatRad. Trinity, for its part, tried to bring StatRad into the lawsuit, but the state court denied its motion to file a third-party complaint. So StatRad was never a party in the state court proceeding.

Eventually, Trinity settled with Nichols for $1.5 million. But there was a catch: Trinity paid only $500,000. As for the remaining one million dollars, Trinity assigned Nichols its right to sue StatRad for any claims that Trinity had against StatRad.

With that assignment in hand, Nichols sued StatRad to recover the $1 million.[1] She claimed that she was entitled to indemnification as an assignee of Trinity. For support, she pointed to the indemnification clause in the credentialing contract between Trinity and StatRad.[2]

Under that clause, the parties agreed to "hold[] the other party harmless from . . . any and all liability" that is "caused or asserted to have been caused directly or indirectly" as a result of "the performance of their duties hereunder." (R. 31-6, Credentialing Agreement, PageID 385.) The clause also states that "[n]othing in this section shall relieve either party from liability proximately caused by its employees in the normal course of their duties." (*Id.*)

After a period of discovery, both Nichols and StatRad moved for summary judgment. Nichols, asserting Trinity's rights, argued that she was entitled to contractual indemnification for

---

[1] Nichols first brought this action in state court and StatRad later removed it.

[2] In her complaint, Nichols also brought claims for common law indemnification and contribution under Michigan law. But Nichols dropped those claims during summary judgment. So only contractual indemnification is at issue.

the medical malpractice claim. StatRad, however, argued that the indemnity clause covered only claims related to credentialing. The district court agreed with StatRad. It concluded that the indemnification clause does not cover Nichols's claim because it was unrelated to credentialing. And so it granted StatRad's motion for summary judgment.[3] Nichols appealed.

## II.

We review a grant of summary judgment de novo. *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021). Summary judgment is appropriate only if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the nonmoving party. *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020).

Under the credentialing contract's choice-of-law provision, Michigan law governs. And since the parties do not dispute this, we apply Michigan's law. *See AtriCure, Inc. v. Meng*, 12 F.4th 516, 525 (6th Cir. 2021) (explaining that when parties agree on governing law, courts do not resolve choice-of-law questions).

## III.

Nichols seeks to enforce Trinity's right to indemnification from the credentialing agreement. Nichols's indemnification claim raises several questions but we believe, like the district court, that the scope of the indemnification clause resolves the case.

For contractual indemnification claims, the Michigan courts begin with a threshold question: Does the claim fall within the scope of the indemnity clause? *See Miller-Davis Co. v.*

---

[3] Before coming to this conclusion, the district court found that if Nichols could recover it would only be for the $500,000 that Trinity paid, not the additional $1 million. Because we think that the indemnity clause does not cover Nichols's claim, we do not address how much she could have recovered.

*Ahrens Const., Inc.*, 848 N.W.2d 95, 102 (Mich. 2014). To answer this, the courts conduct a "straightforward analysis of the facts and the contract terms." *Id.* (internal quotation omitted). And a court's "primary task" in interpreting the contract's terms is to "give effect to the parties' intention" by "examining the language of the contract according to its plain and ordinary meaning." *Id*. So the scope of the duty to indemnify "must be determined from the language of the contract." *Id.* (internal quotation omitted). This means that to prevail, Nichols must show that the language of the indemnity clause covers her medical malpractice claim. But she cannot clear this hurdle.

Begin with the text. The parties agreed to indemnify one another for "all liability" that is "caused" by a party's employees. (R. 31-6, PageID 385.) But this duty to indemnify is not unlimited. It extends only to claims that result from "the performance of" the "duties hereunder."[4] (*Id.*) So to determine the scope of the duty to indemnify, we must interpret the phrase "duties hereunder."

The plain meaning of "hereunder" is "under the authority of this (statute or the like)." *Hereunder*, Oxford English Dictionary, https://www.oed.com/view/Entry/86209?redirectedFrom=hereunder#eid (last visited Feb. 27, 2022). It also means "in accordance with this document" or "later in this document." *Hereunder,*

---

[4] The indemnity clause states in full:

> Each party hereby indemnifies and holds the other party harmless from and against any and all liability, losses, claims, or causes of action, and expenses connected therewith (including reasonable attorney's fees), caused or asserted to have been caused directly or indirectly by its employees or agents, by or as a result of the performance of their duties hereunder. Nothing in this section shall relieve either party from liability proximately caused by its employees in the normal course of their duties.

(R. 31-6, PageID 385.)

*Black's Law Dictionary* (11th ed. 2019). The Michigan Court of Appeals has held that "hereunder" limits the "scope" of an arbitration clause to disputes relating to "rights or obligations" that are "described within the [] agreement." *Hall v. Stark Reagan, P.C.*, 818 N.W.2d 367, 372 (Mich. Ct. App. 2011), *rev'd in part on other grounds*, 823 N.W.2d 274, 274–75 (Mich. 2012). Other courts have given "hereunder" a similar reading. *See, e.g.*, *Tomran, Inc. v. Passano*, 891 A.2d 336, 344–46 (Md. 2006) (collecting cases); *see also Anderson Living Tr. v. Energen Res. Corp.*, 886 F.3d 826, 848–49 (10th Cir. 2018).

And we do the same here. By using the term "duties hereunder," the contract's language limits the scope of the indemnification clause to claims arising from the parties' duties under the credentialing agreement. Thus, StatRad need indemnify Trinity only for claims related to those obligations described in the agreement, which deal solely with credentialing.

Consider the purpose of the credentialing agreement. Trinity wanted to ensure that the StatRad radiologists who provide it with radiology services are properly credentialed. As a result, all the duties imposed on StatRad relate only to credentialing. Under the agreement, StatRad must ensure that its medical staff "hold[] a current license issued or recognized by the State of Michigan." (R. 31-6, PageID 382.) StatRad's credentialing standards also need to meet the applicable regulations. And it must update its policies and procedures to ensure that it is meeting these standards. StatRad also agreed to send Trinity the necessary paperwork related to credentialing and to keep these records updated. All these duties relate to the credentialing and privileging of StatRad's employees.

Importantly, none of StatRad's duties under the credentialing contract include radiology services. And this makes sense. Those radiology services are governed by a separate services agreement—the subcontract between StatRad and X-Ray Associates. The credentialing agreement

ensures that those services are performed by radiologists who are credentialed. And so any obligation on StatRad to perform radiology services is governed by the subcontract with X-Ray Associates, and not the credentialing agreement with Trinity.

True, the credentialing agreement does mention the subcontract. For example, the parties "acknowledged" the "existing" agreement between X-Ray Associates and StatRad "to subcontract teleradiology services for" Trinity. (R. 31-6, Credentialing Agreement, PageID 383.) But they went no further than that acknowledgment. Nothing suggests that the subcontract is incorporated into the credentialing agreement or that StatRad has a duty under the credentialing agreement to provide radiology services to Trinity.

Indeed, when the parties wanted to reference StatRad's duties under the services subcontract with X-Ray Associates, they called them "Contracted Services." For example, in the credentialing agreement, StatRad agreed to "furnish the Contracted Services in a manner that permits [Trinity] to comply with all applicable" regulations. (R. 31-6, PageID 382.) And StatRad also agreed that each "radiologist providing Contracted Services" will be "privileged." (*Id.*) Yet the indemnification provision does not mention these "contracted services." Instead, the parties limited indemnification to claims arising from the "duties hereunder," which all deal with credentialing. Had the parties wanted the indemnification provision to cover these contracted services they would have referenced them as they do in other provisions. But they did not.

In sum, under the credentialing agreement, StatRad need only indemnify Trinity for claims arising from the performance of its "duties hereunder." And StatRad's duties under the credentialing agreement relate only to credentialing and not radiology services, which are governed by StatRad's subcontract with X-Ray Associates.

With that in mind, we agree with the district court that Nichols's original claim for medical malpractice falls outside the scope of the indemnification provision. Nichols's medical malpractice claim had nothing to do with credentialing. The complaint she filed against Trinity alleged negligence by Trinity in diagnosing Scott, including the misreading of his chest CAT scan. Yet she did not allege any negligence related to credentialing. Thus, her claim is unrelated to StatRad's "duties hereunder" and is not within the scope of the indemnification provision.

Nichols contends that we are reading the indemnity clause too narrowly. She argues that "hereunder" does not limit indemnification to duties specifically enumerated in the document and can include other duties. In essence, Nichols would have us extend the indemnity clause to cover claims arising from StatRad's performance of radiology services, even though the credentialing agreement does not require StatRad to perform those services.

But the Michigan Court of Appeals has rejected such a view. When faced with a contract that contained "no language limiting the scope of" indemnity "to claims arising from the agreement," the Michigan Court of Appeals held that "obviously [the defendant] did not intend to indemnify [the plaintiff] for claims unrelated to contract work." *Badiee v. Brighton Area Schs.*, 695 N.W.2d 521, 533 (Mich. Ct. App. 2005). Thus, even without language limiting the scope of an indemnification provision, the Michigan courts do not extend the duty to indemnify beyond claims related to the work under the contract. Here, we have a provision that does have limiting language. So we will not extend the duty to indemnify to claims unrelated to the credentialing agreement.

In any event, Nichols's reading gives no effect to the term "hereunder." If "duties hereunder" includes duties that are both enumerated and unenumerated, then the word is doing no work. But we must give effect to every word in a contract and should not read a word out. *Klapp*

*v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003) ("[C]ontracts must be 'construed so as to give effect to every word or phrase as far as practicable.'" (quoting *Hunter v. Pearl Assurance Co., Ltd.*, 291 N.W. 58, 59 (Mich. 1940)). And here we will not read the word "hereunder" out of the contract.

Nichols also relies on the Michigan Court of Appeals' decision in *Ajax Paving Industries v. Vanopdenbosch Construction Co.*, 797 N.W.2d 704 (Mich. Ct. App. 2010). But this case does not help her. There, the defendant conceded that "the scope of its work under the subcontract" included the work that caused the injury. *Id.* at 708. So the court assumed that the claim fell within the scope of the contract. *Id.* But there is no such concession here. Thus, *Ajax* provides no guidance on whether Nichols's claim falls within the scope of the indemnity clause.

Finally, Nichols points to the insurance clause in the credentialing agreement. Under that clause, Trinity and StatRad agreed to maintain general liability insurance, covering "bodily and personal injury, property damage, and contractual liability," as well as worker's compensation and professional liability insurance. (R. 31-6, Credentialing Agreement, PageID 384–85.) Nichols argues that because StatRad needed to maintain professional liability insurance, the indemnity clause must cover medical malpractice claims. But the Michigan courts have explicitly rejected this argument: "[T]he fact that insurance was required does not enlarge or alter the scope of the indemnification agreement." *Peeples v. City of Detroit*, 297 N.W.2d 839, 845 (Mich. Ct. App. 1980). Thus, the insurance clause does not bear on the scope of the indemnification agreement.

## IV.

Because Nichols has not met the threshold showing that her claim falls within the scope of the indemnity clause, we **AFFIRM**.