*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Conservatorship of BJH.

| | |
|---|---|
| CYNTHIA MIFSUD, | UNPUBLISHED |
| | April 10, 2025 |
| Petitioner-Appellant, | 3:04 PM |
| v | No. 369128 |
| | Wayne Probate Court |
| FAMILY OPTIONS SERVICES, INC., KAREN | LC No. 2021-864847-GA; |
| CALDWELL, RACHEL GREENSHIELDS, | 2021-865509-CA; |
| RANDY HAYES, LISA C. WALINSKE, | 2021-868475-TV |
| DARRELL HAYES, and MELINDA CAMERON, | |
| Other Parties. | |

Before: GADOLA, C.J., and RICK and MARIANI, JJ.

PER CURIAM.

Petitioner-appellant, Cynthia Mifsud, appeals by leave granted[1] the probate court's June 1, 2023 order granting in part and denying in part Mifsud's fiduciary accountings of her disputed actions as attorney-in-fact for her mother, BJH; denying Mifsud's request that attorney fees she incurred in connection with the accountings be paid from BJH's estate; and ordering Mifsud to return to BJH proceeds from the sale of BJH's home. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This probate dispute centers around Mifsud's actions as BJH's attorney-in-fact under a durable power of attorney, and it arises out of a disagreement between BJH and her relatives—including her adult children and grandchildren—regarding her mental capacity, long-term care, and estate. In October 2013, BJH and Mifsud (one of BJH's four adult children) signed a durable

---

[1] *In re Conservatorship of BJH*, unpublished order of the Court of Appeals, entered May 3, 2024 (Docket No. 369128).

power of attorney that authorized Mifsud to act on BJH's behalf as her attorney-in-fact. The power of attorney, in relevant part, authorized Mifsud to manage BJH's assets, including money, real property, and real estate, on BJH's behalf. Mifsud was also authorized to "[e]mploy professional and business assistance as may be appropriate, including attorneys, accountants, and real estate agents." The acknowledgment and acceptance section of the power of attorney, which mirrored the fiduciary obligations set forth in MCL 700.5501(3) under Michigan's Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, detailed the fiduciary duties Mifsud owed to BJH. In other sections, the power of attorney further elaborated Mifsud's duties and potential liability as a fiduciary. The power of attorney provided, among other things, that "[m]y Agent shall not be liable for any loss that results from a judgment error that was made in good faith," but "my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney."

In May 2021, Mifsud filed a petition to be appointed full guardian of BJH. Shortly thereafter, BJH through counsel filed an objection to Mifsud's petition, asserting that "she was not in need of a guardian" and had voluntarily moved out of Mifsud's home "due to financial mismanagement and mistreatment." In light of these allegations, the probate court conducted a hearing to address the matter and, after doing so, suspended Mifsud's authority to act as BJH's attorney-in-fact. The court also appointed a guardian ad litem (GAL) to consider BJH's best interests, file a petition for conservatorship, and act on BJH's behalf throughout the proceedings. Following a hearing in June 2021, the court appointed Family Options Services, Inc. (FOS) as BJH's temporary guardian and special conservator. Mifsud thereafter stipulated to file accountings for BJH's assets during her time as BJH's attorney-in-fact from January 2019 through May 2021.

Mifsud filed accountings for the specified time frame three times throughout the duration of this case. Mifsud's first filing occurred in September 2021. It comprised three accountings (one each for 2019, 2020, and 2021), a petition to allow the accountings, and various financial documents in support of the accountings (including cancelled checks, bank statements, receipts, and self-made excel spreadsheets regarding the types of expenditures she made on BJH's behalf). FOS objected, arguing that the accountings lacked adequate supporting documentation for the claimed expenses, and the probate court ordered Mifsud to file amended accountings that included the proper paperwork and necessary supporting documentation. Despite repeated court orders instructing her to do so, Mifsud did not file her first amended accountings until September 2022. FOS and the GAL again objected to Mifsud's accountings for the same reasons, and Mifsud was again ordered to provide amended accountings with the supporting documentation necessary to substantiate the claimed expenses. Mifsud, with the help of a new attorney, filed her second amended accountings and petition to allow the accountings in November 2022. Mifsud's petition also requested $25,485 in attorney fees and costs associated with preparing the second amended accountings.

Pursuant to the probate court's direction, the GAL reviewed Mifsud's first and second amended accountings and thereafter filed a detailed report and recommendation regarding each of them. The GAL recommended that the court deny all three of Mifsud's amended accountings because they not only inaccurately represented BJH's expenses but also attempted to obtain money from the estate that Mifsud was not entitled to. The GAL noted in her report that although she was able to verify some of the listed expenses associated with BJH's day-to-day necessities, caregiving

services for BJH, and Mifsud's construction of a "grand-pad"[2] for BJH, she was unable to verify well over $100,000 in listed expenses because they "were unsupported by any documentation." The GAL also indicated in her report that the amended accountings suggested that Mifsud had inappropriately used more than $10,000 from BJH's estate on personal expenses; had taken out more than $55,000 in unexplained cash withdrawals from BJH's bank accounts; had incorrectly accounted for the total sale proceeds that resulted from the sale of BJH's home; and had repeatedly requested reimbursements from the estate for expenses that BJH—not Mifsud—had actually paid for. The GAL acknowledged that Mifsud's second amended accountings provided a more organized tabulation of the annual expenses on the proper court forms but stated that her findings and recommendations remained the same because Mifsud had still failed to provide supporting documentation to substantiate the expenses.

In February 2023, the probate court conducted an evidentiary hearing on the second amended accountings, at which Mifsud testified about her time as BJH's attorney-in-fact and the unsubstantiated expenses. In a subsequent written opinion, the probate court found that, even after Mifsud's testimony, Mifsud's accountings "lack[ed] evidence supporting many of the expenses claimed," emphasizing that Mifsud had not presented any evidence "to substantiate the many questionable receipts and expenses." The court also found that Mifsud had breached her fiduciary duties to BJH by failing to maintain accurate records of her transactions as attorney-in-fact and by failing to keep BJH informed of her actions as attorney-in-fact. The court found that $47,922.70 in expenses of the second amended first accounting, $23,081.48 in expenses of the second amended second accounting, and $14,852.60 in expenses of the second amended third accounting "were unsubstantiated, improper or unaccounted for" and therefore could not be approved. The court thereafter issued an order granting the second amended accountings in part but denying them in the aforementioned amounts, denying Mifsud's "attorney fees in the petition to allow accounts," and ordering that "the proceeds from the sale [of BJH's] house . . . be returned to" BJH.[3] This appeal followed.

## II.  STANDARDS OF REVIEW

"This Court . . . reviews for an abuse of discretion a probate court's dispositional rulings and reviews for clear error the factual findings underlying a probate court's decision." *In re Bibi Guardianship*, 315 Mich App 323, 328; 890 NW2d 387 (2016). Likewise, a probate court's "decision whether to award attorney fees" is reviewed for an abuse of discretion, while its underlying findings of fact are reviewed for clear error. *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008). "A probate court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes." *Bibi Guardianship*, 315 Mich App at 329 (quotation marks and citation omitted). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *In re Murray Conservatorship*, 336 Mich App 234, 239-240; 970 NW2d 372 (2021) (quotation marks and citation omitted). "The reviewing court will

---

[2] Mifsud later described the "grand-pad" as a portion of her home that she had converted into an apartment-style living space for BJH after BJH had moved in with her.

[3] The probate court also denied Mifsud's motion for reconsideration on June 28, 2023.

defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *In re Brody Conservatorship*, 321 Mich App 332, 336; 909 NW2d 849 (2017) (quotation marks and citation omitted). We review de novo a probate court's legal conclusions. *Id.* This includes whether the court "properly interpreted and applied the relevant statutes." *Bibi Guardianship*, 315 Mich App at 328 (quotation marks and citation omitted). "An error of law necessarily constitutes an abuse of discretion." *In re Huntington Estate*, 339 Mich App 8, 17; 981 NW2d 72 (2021).

## III. ACCOUNTINGS

Mifsud argues on appeal that the probate court abused its discretion by partially denying expenses in her second amended first and second accountings because she provided evidence substantiating all of the expenses during the specified time frames and because she acted in good faith as BJH's attorney-in-fact when she made the expenses.[4] We disagree.

It is well recognized that an attorney-in-fact is bound to act in the principal's best interests and owes the principal common-law and statutory fiduciary obligations, which include the duties of good faith and loyalty and the prohibition against self-dealing. *Murray Conservatorship*, 336 Mich App at 253-254; *In re Susser Estate*, 254 Mich App 232, 234-235; 657 NW2d 147 (2002); MCL 700.1212(1) (detailing a fiduciary's duties and obligations to the principal). These fiduciary duties and obligations are imposed on an attorney-in-fact upon his or her signing and acceptance of the power of attorney even if the document itself does not "include language expressly imposing a fiduciary duty." *Susser Estate*, 254 Mich App at 236.

At all times relevant here, an attorney-in-fact acting under a durable power of attorney was expressly governed by MCL 700.5501 through MCL 700.5505 of EPIC.[5] MCL 700.5501 set forth certain requirements of a durable power of attorney and provided, in relevant part:

---

[4] Mifsud does not challenge the probate court's findings with regard to any disallowed amount of the second amended third accounting. As to the first and second accountings, we note that, while Mifsud's briefing on appeal indicates that she is not challenging the full amounts that the probate court denied, the briefing is not particularly clear or consistent in articulating exactly what portions she is challenging. Her brief includes a table, for instance, indicating that she is challenging $39,301.77 of the $47,922.70 in expenses that the court denied with respect to the first accounting, and $21,626.22 of the $23,081.48 of the denied expenses from the second accounting. The brief later states, however, that she is challenging the denial of $48,993.99 of expenses from the first two accountings (and then later offers $49,993.99 as the challenged amount). Ultimately, however, we do not find it necessary to resolve these apparent discrepancies in order to properly dispose of Mifsud's challenges on appeal.

[5] Effective July 1, 2024, the Uniform Power of Attorney Act (UPOAA) (MCL 556.201 through MCL 556.505) repealed and replaced the durable power of attorney provisions in EPIC (MCL 700.5501 through MCL 700.5505). See 2023 PA 187. Mifsud makes no mention of the UPOAA and, as noted above, the power of attorney in this case expressly incorporates the language of the

-4-

(3) An attorney-in-fact designated and acting under a durable power of attorney has the authority, rights, responsibilities, and limitations as provided by law with respect to a durable power of attorney, including, but not limited to, all of the following:

(a) Except as provided in the durable power of attorney, the attorney-in-fact shall act in accordance with the standards of care applicable to fiduciaries exercising powers under a durable power of attorney.

\* \* \*

(c) Upon request of the principal, the attorney-in-fact shall keep the principal informed of the attorney-in-fact's actions. The attorney-in-fact shall provide an accounting to the principal upon request of the principal, to a conservator or guardian appointed on behalf of the principal upon request of the guardian or conservator, or pursuant to judicial order.

\* \* \*

(f) The attorney-in-fact shall maintain records of the attorney-in-fact's actions on behalf of the principal, including transactions, receipts, disbursements, and investments.

As previously noted, Mifsud's power of attorney expressly incorporated the language of these provisions in its "acknowledgment and acceptance" section.

In this case, the probate court cited MCL 700.5501(3)(c) and (f) in concluding that Mifsud's accountings should be partially disallowed. Mifsud does not challenge the notion that she did not comply with the fiduciary duties as stated in both these provisions and the power of attorney. Nor does Mifsud challenge the probate court's ability to deny expenses in her accountings as a remedy for that failure. See MCL 700.1308(1)(c), (h) (providing that the court may "[c]ompel the fiduciary to redress a breach of duty by paying money, restoring property, or other means," or "[f]or a fiduciary otherwise entitled to compensation, reduce or deny compensation to the fiduciary"). Rather, Mifsud argues only that the probate court erred by partially disallowing the second amended first and second accountings because the power of attorney exonerated Mifsud from liability "for any loss that results from a judgment error that was made in good faith," and there was no evidence indicating that Mifsud acted in bad faith when she acted as BJH's attorney-in-fact. This argument essentially posits that the expenses could not be denied for lack of adequate substantiation or any other such deficiency because Mifsud acted in

_____

specific provisions of EPIC that are at issue here. Accordingly, and because the EPIC provisions were in effect at the time of the proceedings at issue and were relied upon by the probate court when it rendered its decision now challenged on appeal, we rely on the EPIC provisions throughout the analysis. We also note that we do not see anything in the UPOAA that would alter our disposition of this appeal.

-5-

good faith in how she chose to handle them.  The provision of the power of attorney that Mifsud relies upon, however, does not do the work that she attempts to assign it.

The exoneration provision contemplates, and relieves the attorney-in-fact from liability for, a situation where the principal has incurred a loss by virtue of a good-faith decision by the attorney-in-fact—an investment choice that did not pan out, for instance, or a decision to sell certain property for a price that proved lower than what could have been had.  At issue here, however, are expenses that Mifsud claims to have incurred in connection with BJH's care; Mifsud does not explain what the purported "loss" is to BJH (and indeed, Mifsud contends her decisions as to these expenses saved BJH money).  What Mifsud appears to be seeking is not to avoid liability for a loss that BJH suffered as a result of Mifsud's decisions as to these expenses, but to avoid any loss to herself—and to shift any such loss to BJH instead—for her failure to adequately document and otherwise manage these expenses.[6]

Furthermore, even assuming the power of attorney's exoneration provision did apply, the record supports the conclusion that it did not excuse Mifsud from liability for her conduct as attorney-in-fact.  The power of attorney does not expressly define the term "good faith," but Black's Law Dictionary (12th ed.) defines it, in part, as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation."  See generally *IGCFCO III, LLC v One Way Loans, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 366535); slip op at 6 ("If the terms [of a contract] are ambiguous or undefined, this Court may use dictionary definitions to ascertain their plain and ordinary meaning.").

The record evidence in this case supports the conclusion that Mifsud did not meet this standard in her conduct and decision making as BJH's attorney-in-fact.  As the power of attorney made clear, Mifsud was obligated to "maintain records of [her] transactions as attorney-in-fact, including receipts, disbursements, and investments," but Mifsud admitted—and the documentary evidence supported—that she chose not to do so.  Mifsud admitted, for instance, that she did not keep track of any caregivers' or laborers' billing at the time that they provided services and never obtained 1099's or copies of any checks related to payment to the caregivers or laborers, opting instead to pay them in cash without keeping any such records.  The power of attorney also expressly precluded Mifsud from compensating herself from BJH's assets "for any services provided" as BJH's attorney-in-fact and from gifting herself, her estate, or her "creditors" anything from BJH's assets.  Mifsud, however, admitted to taking out numerous cash withdrawals from BJH's bank account—all of which remained unexplained even after Mifsud's testimony—and to spending BJH's funds on her own personal expenses rather than expenses meant to benefit BJH, including her property taxes, utilities and credit card bills, groceries, airline tickets, meals, and entertainment.  The GAL report also indicated that Mifsud had disguised two fund disbursements

---

[6] Moreover, and relatedly, it seems Mifsud is trying to use this provision of the power of attorney to effectively override the probate court's judgment regarding what level of substantiation is necessary to support a claimed expense.  It is far from clear that this provision is properly read to excuse the attorney-in-fact from adequately substantiating an expense—and to require a court to accept that inadequate level of substantiation—simply because the deficiencies in the attorney-in-fact's proofs were not the product of bad faith.

totaling to $1,055.60 as caregiver fees to family members to obtain the funds for the airline tickets from BJH's estate. Although Mifsud testified that all of the personal expenses were to reimburse herself for expenses she had previously made for BJH's benefit, she provided inadequate or no supporting documentation to support this testimony despite having approximately a year and a half to do so. To the extent Mifsud attempted to explain away any of this conduct as done in good faith, it is apparent that the probate court did not find her credible, and a probate court's factual findings involving matters of credibility are given broad deference. See *Brody Conservatorship*, 321 Mich App at 336.

The record also reveals no clear error in the probate court's findings regarding the amounts of the expenses in Mifsud's accountings that should be denied. In her reports, the GAL indicated that she was unable to verify more than $44,000 in caregiver fees because Mifsud failed to provide supporting documentation or additional explanation for reported caregiver reimbursements. The GAL's report also indicated that Mifsud had claimed more than $29,000 in reimbursement for payments to laborers who constructed the grand-pad but that the submitted documentation showed that BJH had already paid for those services from the estate. Additionally, the report indicated that, although Mifsud was "entitled to some reimbursements for the costs that [she] advanced" for the materials for the grand-pad, the GAL was unable to verify most of the $21,208.96 claimed for such materials. The report also indicated that more than $62,000 in cash withdrawals during that period were not explained or supported by documentation showing how the money was used or that it actually served to reimburse Mifsud for funds that she had previously spent on BJH's behalf, and Mifsud's testimony at the evidentiary hearing did not provide any further explanation. Mifsud also admitted to using more than $10,000 of BJH's funds to pay for her own personal expenses rather than for expenses for BJH's benefit. And despite Mifsud's testimony, the documentation submitted by Mifsud still reflected that she requested reimbursement from the estate for funds that BJH, rather than Mifsud, had actually expended. In light of the record evidence, we are not definitely and firmly convinced that the probate court made a mistake in its findings. See *Murray Conservatorship*, 336 Mich App at 239-240. Accordingly, the probate court did not abuse its discretion by partially denying the expenses listed in Mifsud's second amended first and second accountings. See *Bibi Guardianship*, 315 Mich App at 329.[7]

---

[7] Mifsud criticizes the level of detail in the probate court's explanation regarding the amounts of its denied expenses. Mifsud cites no authority to support this criticism, however, and the Michigan Court Rules indicate that, while such detail may have been required of Mifsud's accountings themselves, it was not likewise required of the probate court's opinion and order disposing of them. See MCR 5.310(C)(2)(c) (requiring an individual filing an accounting to provide an itemized accounting that "show[s] in detail receipts and disbursements during the accounting period" as well as a "written description of services performed or appended regarding compensation sought," but noting that "[t]his description need not be duplicated in the order"); see also MCL 700.1308(2) (providing that, after a court requires a fiduciary to file an accounting and "[a]fter due hearing on the accounting, the court shall enter an order that agrees with the law and the facts of the case"). In her appellate brief, Mifsud also takes issue with the probate court's denial of $757.87 in expenses for computer and software even though, according to Mifsud, those expenses did not

-7-

## IV. ATTORNEY FEES

Mifsud next argues that the probate court abused its discretion by denying her request for $25,485 in attorney fees. As with the previous issue, Mifsud bases this argument on the terms of the power of attorney. Namely, Mifsud maintains that she was entitled to the requested attorney fees because the power of attorney authorized her to hire an attorney, required her to prepare accountings, and entitled her to reimbursement for all reasonable expenses incurred as a result of carrying out any provision of the power of attorney. In making this argument, however, Mifsud ignores that, at the time that she incurred and requested the attorney fees, she was no longer acting under the authority of the power of attorney. As Mifsud does not dispute, her authority under the power of attorney was suspended in May 2021, and she did not incur the attorney fees at issue until a year and a half later in November 2022. Correspondingly, it was not Mifsud's authority or duty under the power of attorney that initiated her preparation and filing of the accountings; rather, it was her stipulation to do so upon request of interested parties after her authority as attorney-in-fact had been suspended and allegations of wrongdoing had been raised. Thus, it cannot be said that Mifsud was acting under the power of attorney when she incurred the attorney fees for the preparation and filing of the second amended accountings.

Even assuming otherwise, the probate court was permitted to deny the fees as a remedy for her breach of fiduciary duties. Given that Mifsud's wrongdoing is what prompted the accountings and litigation and led to her incurring the attorney fees at issue, Mifsud was not entitled to use assets of the estate to pay for those fees. See *In re Nestorovski Estate*, 283 Mich App 177, 204; 769 NW2d 720 (2009) (noting that a fiduciary is not entitled to use assets of the estate to pay for the fiduciary's legal fees related to his or her breach of fiduciary duties when there is evidence of wrongdoing). Additionally, the decision to deny the requested attorney fees was an available statutory remedy under MCL 700.1308(1)(h) as a reduction or denial of compensation to a "fiduciary otherwise entitled to compensation" or under MCL 700.1308(1)(c) as an "other means" to redress Mifsud's breach of fiduciary duties. Accordingly, the probate court's denial of attorney fees was not outside the range of reasonable and principled outcomes. See *Bibi Guardianship*, 315 Mich App at 329.

## V. SALE PROCEEDS

Lastly, Mifsud argues that the probate court abused its discretion by ordering her to return the proceeds from the sale of BJH's home because the power of attorney authorized her to sell BJH's home and she had already deposited the sale proceeds into BJH's account. We disagree.

Mifsud testified at the evidentiary hearing that she had deposited all of the sale proceeds into an account owned by BJH, but she failed to provide documentary evidence to corroborate this testimony at the time of the hearing. The GAL's report indicated that Mifsud had incorrectly accounted for the sale proceeds in the second amended second accounting, and the probate court acknowledged as much in its findings. Thus, it is apparent that the probate court did not find

---

appear on the first accounting. That claim, however, is belied by the record, which shows that those expenses were, in fact, included in the first accounting.

Mifsud's testimony to be credible, and a probate court's factual findings involving matters of credibility are given broad deference. See *Brody Conservatorship*, 321 Mich App at 336.

The probate court's finding is further supported by Mifsud's acknowledgement—both in her motion for reconsideration and now on appeal—that there was a $1,500 discrepancy in the amount of sale proceeds received and the amount of sale proceeds deposited into BJH's bank account.[8] An attorney-in-fact is not permitted to compensate herself or to gift herself money from the principal's assets "unless provided for in the durable power of attorney," MCL 700.5501(3)(d) and (h), and the power of attorney in this case did not permit Mifsud to do either. Mifsud otherwise provided no explanation as to why she apparently deposited most, but not all, of the sale proceeds. Indeed, Mifsud testified that she had deposited *all* of the sale proceeds into BJH's account, but her own later admissions indicate otherwise. Thus, the probate court's finding that Mifsud incorrectly accounted for the sale proceeds in her second amended accountings was not clearly erroneous, and its order requiring that the full amount of the sale proceeds be returned to BJH was not outside the range of reasonable and principled outcomes. See *Bibi Guardianship*, 315 Mich App at 329.[9]

Affirmed.

/s/ Michael F. Gadola
/s/ Michelle M. Rick
/s/ Philip P. Mariani

---

[8] In her subsequent motion for reconsideration, Mifsud provided a copy of the June 25, 2020 check from the title company reflecting the total amount of sale proceeds and a copy of a June 26, 2020 bank receipt indicating that the same amount was taken to a PNC Bank account. The PNC Bank receipt indicates, however, that $1,500 was provided to the customer as a "cash back amount" rather than deposited with the remainder of the sale proceeds.

[9] To be clear, our conclusion is simply that we see no reversible error in the probate court's general determination that the full amount of the sale proceeds must be returned to BJH; we do not purport to opine on exactly what amount of those proceeds still remain to be returned to BJH at this point.